## Richmond

MINNIE SIMPSON v. KENNETH P. SCOTT AND VONNIE
DALTON HALEY, EX'ORS.

April 25, 1949.

Record No. 3475.

Present, Hudgins, C. J., and Gregory, Eggleston, Buchanan, Staples
and Miller, JJ.

The opinion states the case.

*Langhorne Jones* and *Coleman B. Yeatts*, for the plaintiff in error.

*Eugene C. Hurt, Jr.*, and *W. Carrington Thompson*, for the defendants in error.

BUCHANAN, J., delivered the opinion of the court.

Minnie Simpson, plaintiff below, recovered a verdict for $2500 against the executors of Richard Gilmore Haley on an alleged contract by which Haley paid her a small sum each month for domestic services and was to provide additional compensation for her by his will. The court below set this verdict aside on the ground that the plaintiff's claim was barred by the three-year statute of limitation, Code, 1942 (Michie), sec. 5810. This writ of error challenges the correctness of that ruling.

The controlling issue is whether the statute began to run when the services ceased or when Haley died without making the promised provision in his will. Its solution

depends on the terms of the contract and the plaintiff's rights under it.

Her notice of motion, supplemented by a bill of particulars, alleged that when she went to work for Haley he paid her $8 a month and promised that she would be amply provided for in his will to make up the difference between what she was paid and what she should have been paid, assuring her that he would leave her $4,000, and that she continued to work on the faith of that promise.

Her evidence was that Mr. and Mrs. Haley came to see her, stating that Mrs. Haley's health was bad and they wanted her to come and stay in their home and wait on her; that when she went she did not know how much she would be paid; that it was understood the question of pay would wait until it was seen whether the arrangement was agreeable to both parties; that three weeks later they told her she would be paid $8 a month, but they knew that was not enough; that then and many times afterwards when he would pay her Haley said, "I know I am not paying you enough but I am going to remember you in my will and I am going to leave you as much as four thousand dollars in my will;" and that he never at any time while she worked there or later repudiated that statement or told her he was not going to leave her anything.

She went to work on October 15, 1938, doing whatever was to be done in and about the house—cooking, housekeeping, working outside in the garden and feeding the stock when necessary. She stayed there five years, receiving for the first two years $8 a month and for the rest of the time $10 a month. Mrs. Haley died in December, 1939, and plaintiff continued to work and manage the home as before. She testified that the agreement was that she was to stay there until Haley died and manage his home and then be rewarded in his will.

All seemed to go well until Mr. Haley's interest in Miss Simpson (whom he had promised to marry, she said) definitely waned, and he began going with Miss Dalton, whom he later married. "After that we didn't get along,"

said Miss Simpson. She explained that he made the home so miserable for her that she could not stay and finally she told him that if he didn't want her to stay, to send a cab for her and she would leave. He sent the cab and she left on September 7, 1943. Haley and Miss Dalton were married on September 13, 1945. Haley died June 7, 1947, leaving a will dated February 26, 1947, which was probated and which made no provision for Miss Simpson.

Not long after leaving, Miss Simpson sent Mr. Shields to ask Haley to take her back, but he refused to do so. Shields testified for the defendants that Haley said, "I am not letting Minnie come back here any more," and told Shields he had paid her up and did not owe her a "browny." He did not say whether he reported the latter statement to Miss Simpson. He did testify, however, that when Miss Simpson had been at Haley's about three years Haley told him that if she continued as well as she had been doing he was going to leave her some money when he made his will. Miss Simpson testified that some time after she left, Haley came to see her and told her if he did not sell his home he was going to take her back and "leave me the same that he promised to leave me." The home was later sold in May, 1944. There was evidence that Miss Simpson said after she left that Haley did not owe her anything and she did not want anything he had. She denied this and explained that she did not make any claim that he owed her because after all she had done for him she still thought he would keep his promise to leave her something in his will.

The plea of the statute of limitation filed by the defendants alleged that if there was a contract, it was "unequivocally repudiated" by Haley when Miss Simpson left his home. The trial court took the view that the contract was finally breached at that time and ruled that her claim was therefore barred when she brought her suit in March, 1948. We think that was error.

In *Mutual Reserve Fund Life Ass'n v. Taylor*, 99 Va. 208, 213, 37 S. E. 854, 855-6, we said:

"This court has, in the cases of *James* v. *Kibler*, 94 Va. 165, 26 S. E. 417, and *Lee* v. *Mutual Reserve Fund Life Ass'n*, 97 Va. 160, 33 S. E. 556, adopted the rule that when one party to a contract has entirely abandoned it, or has absolutely refused to perform it, the other party may elect to sue on it without waiting for the time of performance to arrive.

"The leading cases on this subject are *Hochster* v. *De La Tour*, 2 El. & Bl. 678; and *Roehm* v. *Horst*, 178 U. S. 1, 20 S. Ct. 780, 44 L. ed. 953."

In *Roehm* v. *Horst*, 178 U. S. 1, 20 S. Ct. 780, 44 L. ed. 953, the English cases, including *Hochster* v. *De La Tour* (add. cit. 118 Eng. Reprint 992, 6 Eng. Rul. Cas. 576), were reviewed and Chief Justice Fuller, delivering the opinion, stated:

"And the doctrine that there may be an anticipatory breach of an executory contract by an absolute refusal to perform it has become the settled law of England as applied to contracts for services, for marriage, and for the manufacture or sale of goods." (44 L. ed. at p. 956).

He also quoted from the case of *Johnstone* v. *Milling*, L. R. 16 Q. B. Div. 467, to the effect that a declaration of intention by the promisor not to carry out his contract when performance time arrives gives the promisee the right of electing either to wait until the time comes for the performance of the contract, or to treat it as a final assertion by the promisor that he is no longer bound. And if the promisee elects the latter, he may then recover as for a breach of the contract. The Chief Justice added:

"The doctrine which thus obtains in England has been almost universally accepted by the courts of this country, * * *." (44 L. ed. at p. 958). See also, *Central Trust Co.* v. *Chicago Auditorium Ass'n*, 240 U. S. 581, 36 S. Ct. 412, 60 L. ed. 811.

▪ Professor Williston vigorously assails this doctrine (Williston on Contracts, rev. ed., vol. 5, secs. 1296-1337), on the ground that the defendant is thereby held liable on a promise he never made, in that he has only promised to

do something on a future date, but is held to have broken his contract by doing something before that date; but he concludes (sec. 1337) that "unquestionably the great weight of American authority, whether rightly or wrongly, accepts the doctrine of anticipatory breach but with some differences from the English law. * * * The rights of a party to a bilateral contract of mutually dependent promises upon an anticipatory repudiation by the other party will then be: (1) To rescind the contract altogether, * * * (2) to elect to treat the repudiation as a breach, either by bringing suit promptly, or by making some change of position; or (3) to await the time for performance of the contract and bring suit after that time has arrived. * * *"[1] See also 17 C. J. S., Contracts, sec. 472, p. 973; 12 Am. Jur., Contracts, secs. 391 et seq., p. 969.

■ Since on the happening of an anticipatory breach the promisee has the right, according to practically all the authorities, to await the time for performance and bring suit when that time has arrived, the statute of limitation on the promisee's right of action does not begin to run until the time for performance fixed by the terms of the contract.

■ "If no action on an anticipatory breach is brought before the time fixed by the contract for the beginning of performance by the party who has committed such a breach, the period of the Statute of Limitations begins to run only from the time so fixed by the contract." Restatement of the Law of Contracts, sec. 322, p. 483.

In *Gold* v. *Killeen*, 44 Ariz. 29, 33 P. (2d) 595, 94 A. L. R. 448, plaintiff was employed by Gold to live with him and work for him until his death, on the promise that he would furnish plaintiff suitable clothing and a home and pay him at the time of Gold's death sufficient to compensate him for his services. Plaintiff complied with this agreement for nine years and then was forced to leave in 1904 because Gold became so abusive to him. He went

---

[1] See also his articles on Repudiation of Contracts, 14 Harvard Law Review 42, 421; and an article by Professor Ballantine in 22 Mich. Law Review, 329, defending the doctrine of Anticipatory Breach.

back several times but on each occasion was driven away by Gold, the last time being 1907. Gold died in 1931, and plaintiff brought his suit against Gold's estate for his services. It was contended that the action was barred by the statute providing that it must be brought within three years from the date of its accrual. But the court held that the plaintiff had the right to elect to treat the breach as inoperative and to await the death of Gold to bring his suit.

In an annotation to this case, 94 A. L. R. beginning at page 455, the general rule is stated to be that in cases of anticipatory breach the limitation runs from the time fixed for performance and not from the time of such breach. Cases are there cited from a number of jurisdictions which reach this conclusion on facts similar to those in the *Gold Case* and to the case in hand. There is little dissent from this view.

In *Ricks* v. *Sumler*, 179 Va. 571, 578, 19 S. E. (2d) 889, 892, suit was on an oral agreement by which the plaintiff was to do the house work and perform other services for the decedent and in return he was to devise to her all his property. The decedent died without making a will. Against a plea of the statute of frauds we held that the plaintiff could recover on the implied contract for the reasonable value of the services rendered. It was further held that since the action was brought within one year after the death of the promisor, it was not barred by the three-year statute of limitations. It was said in the opinion:

"Unless the promisor has previously repudiated the contract, the cause of action for the value of the services rendered under such a contract accrues upon the death of the promisor without having made the devise agreed on, for until that time the debt is not due." (Citing authorities).

It is argued for the defendants that from the phrase "unless the promisor has previously repudiated the contract," it is to be inferred that if the promisor had repudiated the contract, the right of action would have accrued at the time of his repudiation. So it might if the plaintiff had so elected, but if she elected to await the time for performance

fixed by the contract, the death of the promisor, her cause of action accrued then, as was held. See also, *Wheatley* v. *Stapleton*, 151 Va. 295, 144 S. E. 471.

In order to permit the immediate institution of a suit, the repudiation of a contract must cover the entire performance to which the contract binds the promisor and the renunciation must be absolute and unequivocal. 17 C. J. S., Contracts, sec. 472, p. 976; 12 Am. Jur., Contracts, sec. 393, p. 972; Williston on Contracts, rev. ed., vol. 5, sec. 1324, p. 3724.

The evidence in this case does not demonstrate as a matter of law an absolute and unequivocal repudiation by Haley of his contract, as established by plaintiff's evidence, to provide in his will for additional compensation to the plaintiff. There was testimony from a witness that Haley said to her in reference to the wages he was paying Miss Simpson, "I am not paying her but eight and ten dollars a month, just a little spending money for her, but when I die I am going to leave her something." There was evidence that pay in the neighborhood for services similar to those rendered by Miss Simpson ran from $6 to $20 a week. His termination of her employment did not necessarily mean that he was repudiating his promise to give her additional pay for the time she had actually worked. It is true there was evidence that he told others that he did not owe her anything, but there is no evidence that he ever told her that, and she testified that she still expected him to keep that promise by his will.

If the acts and words of Haley did not amount to an anticipatory breach of the entire contract, then the plaintiff's cause of action did not arise until Haley's death. If there was an anticipatory breach, then the plaintiff had an election to wait until Haley's death to bring her suit. She would lose this right of election and the statute would begin to run at the earlier date only if the repudiation was total and recognized and accepted by the plaintiff as a final breach and complete abandonment of performance. Williston on Contracts, *supra*, sec. 2027, at p. 5688; 22 Mich. Law Review, *supra*, at p. 349. On the evidence here, as the jury had a right to

view it, the plaintiff's claim was not barred either under the majority or the minority view of the anticipatory breach doctrine.

The defendants assign as cross-error that the claim of the plaintiff was not adequately corroborated as required by Code, 1942 (Michie), sec. 6209, and that the verdict was without credible evidence to support it.

In addition to the corroboration previously referred to, there was evidence for the plaintiff tending to show admissions by the deceased of the obligation to make additional compensation to the plaintiff. His brother testified that the decedent mentioned to him several times that he was fixing a will making him "administrator" and wanted him to see that the plaintiff "got something at his death;" that he was setting aside "a budget" to take care of their sister and that he could give plaintiff whatever he saw fit from the "budget"; that Haley talked of this after he sold his farm (1944) and never indicated at any time that he was not going to leave her anything. The sum of such evidence, taken in connection with the obvious fact admitted by the decedent, as referred to above, that the amount paid the plaintiff while she was employed by him was inadequate for the work she did, was sufficient to carry the question to the jury. The corroboration here, we think, meets the requirements stated in *Timberlake* v. *Pugh*, 158 Va. 397, 163 S. E. 402. *Cf. Clark* v. *Atkins*, 188 Va. 668, 51 S. E. (2d) 222.

The jury were instructed, without objection, that the burden was on the plaintiff to prove the alleged contract "by clear, explicit and convincing evidence," and to prove that Haley breached this contract. They were also instructed that the testimony of the plaintiff must be corroborated by other evidence from a disinterested source. The verdict of the jury on the issues thus submitted was supported by competent evidence and is conclusive.

The judgment complained of is reversed, the verdict reinstated and final judgment thereon entered for the plaintiff.

*Reversed and final judgment.*