# Richmond

GREENBRIER FARMS, INCORPORATED v. EVELYN W. CLARKE.

June 16, 1952.

Record No. 3930.

Present, Eggleston, Spratley, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*Jas. G. Martin & Sons* and *Samuel Goldblatt,* for the plaintiff in error.

*Herbert & Bohannon,* for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

The plaintiff below, Mrs. Clarke, in April, 1945, filed her notice of motion for judgment against the defendant, Greenbrier Farms, Incorporated, making these allegations:

She had developed a new variety of camellia, unlike any previously grown, a flower of exquisite beauty and unusual coloring and appearance. In 1943 the defendant's agents saw this camellia in bloom and requested permission to take cuttings for the purpose of growing plants for the market, agreeing at the time to pay the plaintiff "a royalty or commission on each plant sold." In 1944 defendant took additional cuttings from said camellia bush and likewise took cuttings in February, 1945, for grafting, all with the same agreement to pay the plaintiff a royalty or commission. In the 1945 camellia show in Norfolk the defendant exhibited blossoms from the plaintiff's plant, the camellia being named "Mrs. Clarke," and had taken orders for plants grown from said cuttings and graftings. On March 29, 1945, plaintiff requested defendant to specify the amount that would be paid to her under the agreement made when the cuttings were taken, but the defendant repudiated said agreement and denied any obligation to the plaintiff.

The notice further alleged that the said camellia was one of rare and unusual beauty and defendant would "profit enormously" from the sale of plants grown from the clippings and grafts; that the plaintiff would have been entitled to royalties or commissions for many years to come, amounting to large sums annually; and that by reason of defendant's repudiation of said agreement she was damaged to the extent of $7,500.

The plaintiff filed a bill of particulars stating, among other things, that no definite percentage or commission was fixed in the agreement with the defendant and that the plaintiff was entitled to the usual percentage paid in such cases, which was 50% of the sales price of the plants; and, further, that if the

plaintiff did not prove a binding contract, by reason of the vagueness of the terms, she was entitled to recover the value of the cuttings and grafts taken by the defendant under its promise to pay.

The defendant moved to strike out the bill of particulars as being unresponsive to its motion that it be filed and as setting up new matter, demurred to the notice and pleaded the statute of frauds, all of which the court overruled. A jury heard the evidence and returned a verdict of $2,000 for the plaintiff, which the court set aside and put the plaintiff on terms to accept $1,000 or submit to a new trial. The plaintiff accepted the terms under protest and assigned cross-error to the reduction.

The defendant made seven assignments of error, the first three of which relate to the pleadings.

It argued that its demurrer should have been sustained because the notice was too vague and indefinite, setting forth no definite contract, no breach and no definite damages. As stated above, the notice alleged that the defendant took cuttings and grafts from the plaintiff's prize camellia bush for the purpose of growing and marketing plants therefrom, and under an agreement to pay plaintiff a royalty or commission on each plant; that the defendant had taken orders for the plants, and when afterwards requested to state the amount that it would pay the plaintiff, the defendant repudiated its agreement and denied all obligation, resulting in damage to the plaintiff in the amount sued for.

■■ The notice sufficiently stated a cause of action and it was not error to overrule the demurrer. The object of a motion for judgment or declaration is to set forth the facts which constitute the cause of action so that they may be understood by the defendant who is to answer them, by the jury who are to ascertain whether such facts exist, and by the court which is to give judgment. Burks Pl. & Pr., 4 ed., § 334 at p. 639; *Eckles* v. *Norfolk, etc., R. Co.,* 96 Va. 69, 71, 25 S. E. 545. The substance of the decisions of this court ''is that even though a declaration or motion for judgment may be imperfect, if it is so drafted that the defendant cannot mistake the true nature of the claim, the trial court should overrule the demurrer, and, if defendant desires more definite information, or a more specific statement of the grounds of the complaint, he should request the court to

require plaintiff to file a bill of particulars." *Alexander* v. *Kuykendall,* 192 Va. 8, 14-15, 63 S. E. (2d) 746, 749-50.

■ Neither did the court err in refusing to strike out the bill of particulars that was filed. It did not make a different case or add a new theory, as argued by defendant. The notice alleged an agreement to pay a royalty or commission on sales and a refusal by the defendant after the cuttings were taken to specify the amount, followed by its denial of any obligation. The bill of particulars gave notice that if the plaintiff failed to prove an express agreement on compensation she would claim compensation on the basis of the value of the property taken under defendant's promise to pay. From the notice of motion, as supplemented by the bill of particulars, the defendant could not have been, and as the development of the case demonstrated, was not, misled or mistaken as to the cause of action alleged and the object of the motion. *Kennedy* v. *Mullins,* 155 Va. 166, 179-80, 154 S. E. 568, 572.

■■ The plea of the statute of frauds alleged that the contract sued on was not to be performed within a year, and hence was not enforceable because not in writing. Code, 1950, § 11-2 (7). The plea was not applicable to the cause of action alleged nor to the case made by the evidence and no reversible error was committed in overruling it. The plaintiff performed her part of the alleged agreement when she furnished the clippings. The agreement alleged was not one that she could not perform within a year. " '(A)n agreement does not fall within the statute if that which one of the parties is to do is all to be performed within a year; in other words, the agreement must contemplate non-performance by both parties within the year.' Deferred payments do not change the situation." *Smith* v. *Payne,* 153 Va. 746, 758, 151 S. E. 295, 299.

Defendant next asserts that the court erred in not setting aside the verdict and granting it a judgment or a new trial, and that the judgment granted was contrary to the law and the evidence. The evidence was in conflict on practically all material points, and it must now be considered as the jury had a right to evaluate it to determine whether it was sufficient to support their verdict.

Plaintiff's camellia bush was 13 or 14 years old and was budding when Thrasher, defendant's agent, saw it in the spring of 1943 and was attracted by it. He inquired its name, which

plaintiff did not know, and took away the bud in an effort to get it identified. He came back later and told plaintiff that those to whom he showed it, including his expert at Greenbrier Farms, had never seen anything like it before. He told the plaintiff he thought the commercial value of it was very good; that he would like to take some clippings and try to grow them and if he could grow them he would see if they could get a patent on the camellia and pay her royalties on it. Robinson, propagator of camellias for defendant, was with Thrasher on that trip and later; in September, 1943, Robinson came back and took 102 clippings; again in 1944 he took 80 clippings and in February, 1945, Thrasher took approximately 45 clippings for grafts.

At the 1945 camellia show in Norfolk this camellia was exhibited by the defendant, and at the 1946 show at William & Mary College, at which it took first prize, Thrasher told an inquirer that his company had exclusive sales rights on this camellia and that the smallest one he could get, 12 or 15 inches high, would be about $15.

In 1945, and before the show of that year, Thrasher came to the plaintiff's home and offered her $250 for the camellia bush, which the plaintiff declined. The plaintiff then inquired what Thrasher was going to do about the clippings he had already got, to which Thrasher replied he wasn't going to do anything; that he had already paid for them by the plantings which had been done for the plaintiff. This referred to some azaleas and shrubs that the defendant had caused to be planted on the plaintiff's premises in 1943, which the plaintiff said were worth, at the most, not more than $50. Plaintiff testified this was a voluntary act for which she had never received a bill and she thought it was intended as a gift and gesture of good will.

The plaintiff had never been able to get Thrasher to say how much he was going to pay her on the sale of plants grown from the clippings from her plant. She said no price was fixed but that Thrasher said they would work out a progressive plan by which the plaintiff would receive a share of the proceeds from each plant that was sold, and it was on that basis that the cuttings were taken. On cross-examination she was asked whether Thrasher agreed to pay royalty and she replied, ''He agreed to pay me,—nobody can pay royalties unless there is a patent,— he agreed to pay me my share of what the plant was selling for or worth, on the profits, my share of the profits.'' Nobody other

than the defendant had ever been allowed to take any clippings from the bush.

Defendant's evidence was to the effect that the first cuttings were taken in 1941; that no such promise as the plaintiff claimed was then or thereafter made to her; that the plaintiff's camellia was not a new variety but was on the market by two or three other names and hence could not be patented; that the cuttings taken from plaintiff's plant had little value and had been more than paid for by the plantings done on plaintiff's premises.

Thrasher testified that when he went back for cuttings the second time he said to the plaintiff, "Now, we do not have any intention of taking your cuttings without giving you something for them. How about fixing up your yard? * * * You gave me cuttings, and I want to give you something." And, "later on something was said about its being a rare plant, it might be patented, and one thing and another." He said that in 1945 he offered plaintiff $250 for her plant "and she finally brought up the question again of royalties or getting something out of it." He told her they could not pay royalties on a plant already in the trade and he did not know whether this one was or not. "We will have to find out before we can say anything about it, but we will have to have the plant and all the cuttings off it before we could patent it, and if it proves to be a rare plant I will take it up with my associates to see what we can do about it. Before Mrs. Clarke made up her mind whether she wanted to sell it, or not, we found out positively, so far as we could tell, it was in the trade under two or three different names."

█ The evidence fully warranted a finding that the clippings taken were not a gift, but were taken upon an agreement that the plaintiff would be compensated. Defendant's counsel in objecting to one of plaintiff's instructions stated that it was not claimed that the cuttings were a gift, but "the question is simply whether the defendant has failed to pay the plaintiff what it agreed to."

Plaintiff's testimony was that defendant agreed to pay her a part of the sales price received by defendant for plants sold and to be sold from the clippings taken, but without an agreement as to a definite sum. She termed it a royalty or commission. It was to be a royalty if the camellia was patented, but she testified that while her plant was rare and unusual (there was other evidence to that effect), she could not prove it was the

only one of its kind, which was necessary to get a patent; but that as long as there was a sale for her camellias, she was entitled to her share, which she thought should be 50%, a percentage which she testified had been paid to others under similar circumstances.

There was evidence that in the three years involved 227 cuttings had been taken for rooting and grafting. The plaintiff testified that Robinson told her in 1945 that the defendant was selling the rooted cuttings for $15 each and the grafts for $30 each and at that time they had taken 30 orders, fifteen for $15 each and fifteen for $30 each. Robinson testified that those sales were all made before this suit was brought in April, 1945; that the sales were made in 1944, some delivered then and others in 1945, and those were the ones that had been sold at from $15 to $30 each. Then this appears in his cross-examination:

"Q. And the rest of the clippings that you rooted and the grafts that you made are still at Greenbrier Farms?

"A. Yes, sir.

"Q. You have them there?

"A. Yes, sir.

"Q. Of course, you can sell them, they are for sale?

"A. Yes, sir."

He further testified that at the time he left Greenbrier Farms on July 1, 1947, the defendant had approximately 174 plants derived from the cuttings obtained from the plaintiff, which included rooted cuttings and grafts from the first cuttings that were rooted.

When the defendant repudiated the contract and denied all obligation to the plaintiff, the plaintiff had the right to sue for entire damages. *Simpson* v. *Scott,* 189 Va. 392, 53 S. E. (2d) 21.

There was evidence sufficient to support a finding that she was to have a reasonable share of the amount received from the sales that had been made and of the amount to be received for the approximately 174 plants still at the Farms and available for sale. The jury determined this share to be $2,000. That sum approximated 50% of the sales price of the 30 plants sold and of the 174 to be sold, calculated on the same basis. It did not, however, take into account the cost of developing the cuttings into salable plants. That such cost was substantial was clearly shown. Defendant's evidence was that it amounted to approximately 75% of the sale price of the plant. "Approximately" is,

of course, an elastic word. The process of developing the plants from the cuttings was described in the evidence and affords firm basis for a conclusion that a cost of 50% was more clearly indicated.

The evidence as a whole was sufficient to support a verdict for the plaintiff and the amount she was entitled to recover was for determination by the jury. *Manss-Owens Co.* v. *Owens & Son,* 129 Va. 183, 105 S. E. 543; *Wood* v. *Pender-Doxey Gro. Co.,* 151 Va. 706, 144 S. E. 635; *Waller* v. *Welch,* 154 Va. 652, 153 S. E. 722. But the proper amount of the damages had to be ascertained from and warranted by the evidence.

It was apparent to the court that the jury had fixed the damages without proper regard to an important element affecting the amount, *i. e.,* the expense attached to the production of the plants for sale. The evidence showed with fair certainty what that cost was and the court was warranted in requiring a corresponding reduction in the verdict. The resulting judgment was fairly supported by the evidence and we think it should not be disturbed.

Defendant also complains of instructions given for the plaintiff and the refusal of two offered by the defendant. It is sufficient to say that the instructions given for the plaintiff, as well as for the defendant, properly submitted to the jury the real issues in the case; *i. e.,* whether the defendant took the cuttings under a promise to pay, and if so, what amount would fairly compensate the plaintiff for the loss occasioned by defendant's failure to perform. Instruction D-1 refused to the defendant would have limited recovery to a portion of the profits from plants sold, without regard to those unsold, and would have required credit to be given for the plantings referred to above. It would have submitted theories not tenable under the evidence. Refused Instruction D-3 would have told the jury that the defendant had the right to reach, and did reach, the conclusion that the camellia was a common variety. It would have invaded the jury's province and was inappropriate to the evidence. There was no error in the rulings on instructions.

This that was said in *Kennedy* v. *Mullins, supra,* is applicable here: "To remand the case for amendment and retrial is to require another trial to test the merits of the same controversy over which the parties have already had their day in court and one fair trial on the merits." 155 Va. at p. 180, 154 S. E. at p. 572.

The judgment below is *Affirmed.*