582 F.2d 1321
 In re CITY OF FAIRFAX, VIRGINIA, Plaintiff,
v.
WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY et al.,
Defendants (nine cases).
CITY OF FAIRFAX, Appellee,
v.
CITY OF ALEXANDRIA, Appellant.
CITY OF FAIRFAX, Appellee,
v.
ARLINGTON COUNTY, VIRGINIA, Appellant.
CITY OF FAIRFAX, Appellee,
v.
CITY OF FALLS CHURCH, Appellant.
CITY OF FAIRFAX, Appellee,
v.
COUNTY OF FAIRFAX, VIRGINIA, Appellant.
CITY OF FAIRFAX, VIRGINIA, Appellee,
v.
PRINCE GEORGE'S COUNTY, MARYLAND, Appellant.
CITY OF FAIRFAX, VIRGINIA, Appellee,
v.
DISTRICT OF COLUMBIA, Appellant.
CITY OF FAIRFAX, VIRGINIA, Appellee,
v.
WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Appellant.
CITY OF FAIRFAX, VIRGINIA, Appellee,
v.
WASHINGTON SUBURBAN TRANSIT DISTRICT, Appellant.
CITY OF FAIRFAX, VIRGINIA, Appellee,
v.
MONTGOMERY COUNTY, MARYLAND, Appellant.
 Nos. 77-2124 to 77-3132.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 4, 1978.
Decided Sept. 19, 1978.
 
 William H. Horkan, Sp. Counsel to Washington Metropolitan Area Transit Authority and Washington Suburban Transit Dist., Washington, D. C. (Cyril D. Calley, City Atty., Alexandria, Va., Jerry K. Emrich, County Atty., Arlington, Va., John R. Risher, Richard Barton, Edward Schwab, Corp. Counsel, Dist. of Columbia, Washington, D. C., Frederick Lee Ruck, County Atty., William McCauley Arnold, Asst. County Atty., Fairfax County, Fairfax, Va., Paul T. O'Grady, City Atty., Paul M. Mahoney, Asst. City Atty., Falls Church, Va., Richard S. McKernon, County Atty., Richard E. Frederick, Francis T. Lacy, Asst. County Attys., Montgomery County, Rockville, Md., James C. Chapin, Upper Marlboro, Md., Steven M. Gilbert, Associate County Atty., Prince George's County, Upper Marlboro, Md., for appellants.
 John H. Rust, Jr., Fairfax, Va., Joseph V. Buonassissi, II, Rust, Rust & Pratt, Fairfax, Va., for appellee.
 Before HAYNSWORTH, Chief Judge, and RUSSELL and WIDENER, Circuit Judges.
 DONALD RUSSELL, Circuit Judge:
 
 
 1
 This is an action on contract. The contract arose in connection with the construction of a Metrorail system to serve the Washington (D.C.) area. To effectuate this end, the Washington Metropolitan Area Transit Authority (hereinafter referred to as the Authority) had been created as a body politic by an Interstate Compact between Maryland, Virginia and the District of Columbia, for the purpose of constructing a rapid rail transit system in the Washington Transit Zone. Such Zone covered the political entities of Prince George's County (Maryland) Montgomery County (Maryland), Fairfax County (Virginia), Arlington County (Virginia), the Cities of Alexandria, Fairfax and Falls Church (Virginia) and the District of Columbia. The terms of the Compact contemplated that the Authority should develop, subject to the approval of the several political entities to be served, a mass transit plan in line with the Compact's purposes, along with a proposed method of financing construction of such transit system to be approved and participated in by the several political entities involved, as well as the Federal Government.
 
 
 2
 In 1969, the Authority adopted, with the approval of the eight local jurisdictions within the Transit Zone, a mass transit plan, described by the parties to this appeal as ARS-68 (Revised). Such plan provided for a 100-mile Metrorail system, consisting of a number of routes designated on the plan by letters of the alphabet. The one with which this appeal is particularly concerned was designated as Route K, beginning at Rosslyn, Virginia, and terminating at Nutley Road near Vienna, approximately three-quarters of a mile from the boundaries of the City of Fairfax. This particular Route was designed primarily to serve the residents in the area of the City of Fairfax. The entire plan was premised upon an estimated construction cost for the system as a whole of.$2.5 billion, to be financed from three sources: 1. Contributions, representing two-thirds of the estimated costs, from the Federal Government; 2. Contributions from the eight local political entities within the Zone; and 3. The proceeds of revenue bonds to be issued by the Authority. This method of financing was adopted because the Authority had no independent taxing authority, and, except for the proceeds of revenue bonds and grants from the Federal Government, was dependent upon contributions committed to it by the eight local political entities.
 
 
 3
 In January, 1970, the several local political units, including the plaintiff City of Fairfax, entered into a Capital Contributions Agreement, under the terms of which each of the units promised to contribute a certain sum, calculated under a formula set forth in the Agreement, toward the fulfillment of the planned development. It was recognized in the Agreement, however, that the costs of construction could exceed this initial estimate and the local entities promised their "faithful cooperation and best efforts" to raise any additional local share required. The Agreement, in turn, obligated the Authority to use the funds contributed by the local units and funds realized from the other two sources of financing to construct the planned system "with all practical dispatch" substantially in accordance with ARS-68 (Revised) "as the same may hereafter from time to time be altered, revised or amended in accordance with the Compact," subject to this provision set forth as paragraph 2.1 of the Agreement:
 
 
 4
 "No such revision, alteration or amendment which would reduce the facilities to be constructed in accordance with the Adopted Regional System 1968 (Revised) within any Political Subdivision (or in the case of the City of Fairfax and the City of Falls Church, reduce the facilities serving such Political Subdivision) shall be adopted without the consent of such Political Subdivision."
 
 
 5
 Since it was "understood and agreed that definitive net project costs for the Transit System will not be determined until * * * completed," the Agreement, also, required the Authority, as the construction proceeded to make a recomputation of the contributions required of each local entity under the established formula on the basis of any increase in the estimated costs of completing the project beyond those originally contemplated. If, as a result of such increase in costs, an additional contribution were required, the local jurisdiction would be requested to contribute to such increased cost in accordance with the established formula. All the jurisdictions also agreed to use their "best efforts" to make such additional contributions as were requested of them because of such additional costs. The first date fixed for such recomputation was "a date five years after the start of construction of the Transit System, or July 1, 1974, whichever is the later date." Other recomputations were to be made "at least every two years" thereafter. This Agreement further incorporated a design and construction schedule in order to assure a sequence of construction of the System, "in which the construction activity would be carried out to achieve essentially equitable treatment of each of the jurisdictions as monies became available and work was accomplished."
 
 
 6
 As the project proceeded costs did escalate beyond the initial estimate. At the time of the trial, the completion of the system was estimated to cost in excess of five billion dollars. However, by 1975, the funds raised by the political subdivisions under the first financing plan were practically exhausted. Moreover, the Congressional appropriation for the project was likewise near exhaustion. The Authority was accordingly confronted with the problem of devising a new or revised financing plan in order to keep the project going and to avoid costly delays in the orderly prosecution of the project. The most important problem in connection with such financing plan was the federal support for the project, which had been increased from two-thirds to four-fifths of the cost of the program. Any additional federal funds could only be secured promptly from the Highway Trust Fund under the Federal-Aid Highway Act of 1973. The Administrator of the Urban Mass Transportation Administration, in order to make these increased Highway Trust funds available for the construction of certain parts of the proposed system, demanded that some parts of the system be deferred until an alternatives analysis study was completed for the purpose of determining whether another mode of transportation would be more cost effective for the corridors to be served by certain parts of the routes which included Route K from Glebe Road to Nutley Road Station. Until this alternatives study was completed, final completion of Route K was to be deferred. Moreover, any construction of Route K beyond Glebe Road was impossible because of the unavailability of a right-of-way in the median of proposed Interstate 66 along which the rail line was to run from Glebe Road to Nutley Road Station. Until Interstate 66 was free of litigation, it was uncertain whether that highway would be constructed and whether there would be a median in such highway along which the Metro system could run.
 
 
 7
 Confronted with these difficulties, the Authority sought to reach an agreement with the local jurisdictions which would permit the continued construction of that part of the entire project for which there was federal financing then available and the construction of which was not impeded by pending litigation or delayed pending an alternatives study. To this end, the local jurisdictions (other than the City of Fairfax)[1] entered into an Interim Capital Contributions Agreement whereby the local political units would contribute sufficient local funds, which supplemented by federal highway transfer funds, would permit the construction of those parts of the project then approved for the use of federal funds. This Interim Plan, as originally drafted in October of 1976, included this provision pertinent to the controversy between the parties:
 
 
 8
 "No signatory of this Agreement shall be obligated to fund construction not included in this Agreement or to pay in excess of the amounts specified above, except for interest penalties in accordance with Paragraph 1 above. Funding of additional construction beyond that covered in this Agreement shall be dependent upon the adoption of a financial plan and a new or revised Capital Contributions Agreement."
 
 
 9
 However, at least two of the political units which were to execute the Interim Capital Contributions Agreement expressed dissatisfaction with the inclusion in the Plan of the quoted provision. Thus Prince George's County at the meeting of its Council on December 21, 1976, conditioned its agreement to the Plan on the understanding "that this Agreement in no way abridges the rights and responsibilities of the various parties to the January 9, 1970, WMATA Capital Contributions Agreement to complete the Metrorail system" and "that the Office of Law is authorized to change the language of Paragraph 3 (the quoted provision) to further carry out the concept that there be no such abridgment." After some discussion among the parties to the Plan, it was agreed to "delete Paragraph 3 (the quoted provision) in its entirety" from the Plan and to provide that "(n)o language will be included in the revised Interim Agreement, in other words, which might be read to compromise or modify the 1970 Agreement." Confirmatory of this change, the Montgomery County Council formally approved on January 11, 1977, the deletion of "Paragraph 3" from the Interim Capital Contributions Agreement and added "that the Montgomery County Council understands that the amended Interim Capital Contributions Agreement is not intended to alter the obligations of the respective signatories to the original Capital Contributions Agreement as set forth in that Agreement."
 
 
 10
 In the meantime, the plaintiff City of Fairfax filed this action on December 13, 1976, against the Authority and the local jurisdictions which were signatories to the Interim Plan. The basic claim made by the plaintiff was that the Interim Capital Contributions Agreement of 1976 "constitute(d) a repudiation and breach of the Capital Contributions Agreement (of 1970) and represent(ed) a refusal to perform thereon on the parts" of the other signatories to the Agreement of 1970. It accordingly sought both injunctive relief and damages against the Authority and the other local political entities which were signatories of that Agreement. After a trial, the District Court found that the defendants had breached the 1970 Capital Contributions Agreement, but denied any injunctive relief, holding that plaintiff's remedy was for damages, which it proceeded to assess as the amount of the plaintiff's contribution to the project. From this judgment entered on these findings, the defendants have appealed. We reverse.
 
 
 11
 Plaintiff premised its right of recovery on the doctrine of anticipatory breach or, as it is sometimes described, a "breach by anticipatory repudiation." Under this doctrine, if one party to a contract declares in advance that he will not perform at the time set for his performance, the other party may bring an immediate action for total breach of the contract. That doctrine, though sometimes criticized as a harsh remedy,[2] has been generally accepted both in federal and state decisions,[3] including those of Virginia[4] and Maryland.[5] It is included in the Restatement of Contracts[6] as well as in the Uniform Commercial Code.[7] But "(t)o constitute an 'anticipatory breach,' (within this rule) it must appear that the party bound under a contract has unequivocally refused to perform,"[8] or, as the Supreme Court put it in Dingley v. Oler, supra, at 502 of 117 U.S., at 854 of 6 S.Ct., there must be "a positive, unconditional, and unequivocal declaration of fixed purpose not to perform the contract in any event or at any time."[9]
 
 
 12
 The strictness of this requirement of an absolute and unequivocal refusal to perform is illustrated by a number of cases in this and other circuits as well as in the Supreme Court itself. In Frank F. Pels Co. v. Saxony Spinning Co. (4th Cir. 1923) 287 F. 282, 288, there had been much controversy over the contract, which was the subject of the litigation, and the defendant, which had had considerable difficulty in securing performance by the plaintiff, refused to proceed unless the plaintiff made "satisfactory arrangements with (it)" for the latter's performance under the contract. This conditional refusal was found not to satisfy the test of "an absolute, positive, and unequivocal refusal to comply" required under the doctrine of anticipatory breach.
 
 
 13
 Similarly, in Suburban Improvement Co. v. Scott Lumber, Supra, at 337 of 67 F.2d, the defendant had denied it was bound under the contract, contending that the agreement was a mere option. This was held not "equivalent to refusing to take the lots which it was obligated to take" under the contract and insufficient to support a claim of anticipatory breach.
 
 
 14
 Nor are these decisions of our Circuit out of line with the rule as it has been applied either by other Circuits or by the Supreme Court itself. Thus, in Dingley v. Oler, Supra, the defendant, while declining to deliver ice in the 1880 season as agreed, did suggest that if the price increased, they might deliver. In finding error in the trial court for holding on those facts an anticipatory breach, the Supreme Court said:
 
 
 15
 "Although in this extract they decline to ship the ice that season, it is accompanied with the expression of an alternative intention, and that is, to ship it, as must be understood, during that season, if and when the market price should reach the point which, in their opinion, the plaintiffs ought to be willing to accept as its fair price between them. It was not intended, we think, as a final and absolute declaration that the contract must be regarded as altogether off, so far as their performance was concerned, and it was not so treated by the plaintiffs. * * *
 
 
 16
 "This, we think, is very far from being a positive, unconditional, and unequivocal declaration of fixed purpose not to perform the contract in any event or at any time." 117 U.S. at 501-502, 6 S.Ct. at 853-54.
 
 
 17
 In McCloskey & Co. v. Minweld Steel Co. (3d Cir. 1955) 220 F.2d 101, 104, the defendant, a subcontractor, had agreed to supply the steel required in the construction of a major hospital. There was delay in performance by the defendant and the plaintiff, the primary contractor, sought from the defendant assurance of the latter's ability to perform under its contract. The defendant replied that it was unable to secure the steel needed for performance, that it had been turned down by all the steel suppliers and it requested the assistance of the plaintiff itself in securing the steel. The plaintiff charged that such a reply represented a plain manifestation of an inability to perform. The Court held, however, that there had been no anticipatory breach because the defendant had not declared that it "had definitely abandoned all hope of otherwise receiving the steel and so finishing its undertaking."
 
 
 18
 McCloskey emphasized what is another essential element in the anticipatory breach doctrine, I. e., that it must be a repudiation of the very essence of the contract.[10] It cannot consist of a mere partial breach;[11] nor can it be based on mere delay unless the contract makes time of the very essence.[12] The rule is that, in order to give rise to an anticipatory breach which will support an action for breach of the contract, the breach must be "so material and substantial in nature that it affects the very essence of the contract and serves to defeat the object of the parties;"[13] it must be a "refusal to perform * * * of the whole contract or of a covenant going to the whole consideration;"[14] and it must be "of such substantial character as to defeat the object of the parties in making the contract."[15] As Corbin summarizes it, the non-performance or breach of a part of the contract "not going to the essence" of the contract will not support an action "for a total non-performance of the contract, unless he awaits the occurrence of an additional breach by the other party that is so material in character that, when added to the partial breach, the two taken together go to the essence and make the breaches so substantial as to be total." 4 Corbin on Contracts, § 972, p. 901.
 
 
 19
 Of course, the repudiation, though it must be unconditional and total, need not be express or dependent on "spoken words" alone; it may rest on a defendant's conduct evidencing a clear intention "to refuse performance in the future," such as placing himself "in a position in which performance * * * would be impossible * * * ."[16]
 
 
 20
 In the application of these principles to the facts of a particular case, the initial inquiry to be addressed centers on the determination of the basic object sought to be secured by the plaintiff from the agreement and the consideration for which the plaintiff bargained in entering into such contract. This is so because, as we have noted, an anticipatory breach which will support an action for breach of the contract must go "to the whole consideration" of the contract and must relate to "the essence of the contract," so far as the complaining party is concerned. To repeat, it cannot rest on a "partial breach" or on a breach of a provision in the contract or agreement which is not "so substantial as to defeat the object of the parties in making the contract."
 
 
 21
 Considered in the light of these criteria, the record makes it crystal clear that the plaintiff's real object in executing the 1970 Agreement was to secure the construction of Route K of the Metrorail for the benefit of its citizens. That manifestly was the consideration it bargained for in return for its agreement to contribute to the costs of the project. That for the plaintiff was the "essence" of the agreement. The language of the 1970 Agreement itself makes this plain. The relief demanded by the plaintiff in its complaint also attests to this fact: The plaintiff asked the Court in the alternative either to issue a mandatory injunction which would require the completion of Route K or for damages in the amount of its contributions, either in dollars or credit, to the overall project. In addition, the plaintiff's city manager, in his testimony, declared unequivocally that this was the object of the plaintiff in executing the 1970 Agreement. In answer to the question, "Assuming that Nutley Road station (now referred to as the Vienna Station) could be built by, say, between 1982 and 1984, would Metro have complied with its obligations under the Capital Contributions Agreement of 1970?", he candidly conceded, "In my opinion, yes." The repudiation in this case thus must consist of an absolute, positive and unequivocal refusal to construct Route K on the part of the defendants, or some act on the part of the defendants which made it impossible for Route K to be completed. If the record will not support such a finding, there is no anticipatory breach and there can be no recovery by the plaintiff in the present action for breach of the 1970 Agreement.
 
 
 22
 The record is wholly insufficient to support a finding of an unequivocal repudiation or abandonment by the defendants of the plan to construct the full length of Route K as provided in the 1970 Agreement. The only basis on which the plaintiff asserted there was such an express repudiation or abandonment was the execution by the defendants of the Interim Capital Contributions Agreement in 1977. When the Authority considered the initial draft of this Interim Capital Contributions Agreement, however, it firmly disclaimed any purpose of effecting thereby "an abrogation of the existing Agreement (I. e., the 1970 Agreement)" and it restated at the time it approved such draft for submission to the local jurisdictions "the intention of the Authority that the entire 100-mile system (would) be built." When this initial draft was submitted to the local jurisdictions for their approval and execution, those defendants, as we have said, expressed concern whether the proposed Plan was sufficiently clear on their common resolve to complete the project as planned under the 1970 Agreement, particularly in the light of Paragraph 3 of such draft. The general counsel of the Authority sought to allay their concern by assuring the local jurisdictions, including the plaintiff, that in his opinion all the terms of the 1970 Agreement "will remain viable after execution of the Interim Agreement." Despite this assurance of the Authority's general counsel who was presumably responsible for the initial draft of the Plan, some of the local jurisdictions still found Paragraph 3 of the initial draft of the Interim Plan objectionable because of what they considered its possible ambiguity on the continued resolve of the parties to construct as planned the entire Metrorail system, including Route K. Typical was the action of the County Council of Prince George's County. That Council, in a formal resolution, conditioned its execution of the Interim Plan upon the following specific understandings:
 
 
 23
 "(F)irst, that it is understood by Prince George's County that this Agreement in no way abridges the rights and responsibilities of the various parties to the January 9, 1970, WMATA Capital Contributions Agreement to complete the Metrorail system; second, that the Office of Law is authorized to change the language of Paragraph No. 3 to further carry out the concept that there be no such abridgement; and, third, that the Agreement itself not be executed until after a satisfactory Memorandum of Understanding with Montgomery County has been signed by that County and concurred in by the Department of Transportation, State of Maryland."
 
 
 24
 The initial Interim Plan, as originally approved for submission to the local jurisdictions for approval, was accordingly changed and, in its final, executed form, Paragraph 3, which the plaintiff as well as other local jurisdictions had found inappropriate, was deleted and the clear intention of all the parties not to abandon or repudiate their obligations under the 1970 Agreement to complete the system in accordance with ARS-68 (Revised), including Route K, was reaffirmed.
 
 
 25
 It is accordingly manifest that whether Paragraph 3 of the initial draft of the Interim Capital Contributions Agreement could be read as suggesting that the parties to that Plan had repudiated their 1970 Agreement to complete the project as outlined in ARS-68 (Revised) is irrelevant. This is so because, as we have already pointed out, that Paragraph was deleted from the final draft of the Interim Plan, which the defendants executed and to which they agreed. And it was deleted because the defendants did not want to leave any doubt about their intention and resolve to complete the full project as planned. Yet, despite all this, the plaintiff has persisted in arguing that the initial draft of the Interim Plan, adopted by the Authority on December 2, 1976, and thereafter submitted to the local jurisdictions for their approval with the challenged Paragraph 3 included, represented the agreement of the parties. And the District Court appears to have accepted this argument and to have rested its conclusion largely on a finding to this effect. Thus, it found:
 
 
 26
 "The breach in this case occurred when WMATA approved the interim capital contributions agreement on December 2, 1976. That amendment terminated the K Route at Glebe Road in Arlington a substantial reduction in facilities serving the City of Fairfax."
 
 
 27
 What both the plaintiff and the District Court would disregard is that the Authority had no authority to bind any of the local jurisdictions to any obligation or, for that matter, to absolve them from any obligation which they had previously assumed. The Authority was merely the agent to carry out the agreements made by the local jurisdictions and to perform such functions as were delegated to it by those jurisdictions. This was the reason the Authority submitted the initial draft of the Interim Plan to the local jurisdictions for approval and it was the reason that the Interim Plan was not treated as operative and effective until it had been duly executed by the local jurisdictions. At best the Interim Plan as considered by the Authority on December 2, 1976 was no more than a proposal and, until it had been approved and executed by the local jurisdictions which were to be bound by it, it remained a mere proposal, an incomplete agreement without binding effect on the parties named. It only gained the stature of an agreed contract when all the parties thereto had joined in its execution. Indeed, it is difficult to understand how the plaintiff could assume that a proposed contract, which the necessary parties never actually signed or even approved could be a valid and binding contract until all those parties to be bound had actually approved and executed such contract. The reliance of the plaintiff, as well as the District Court, upon the initial draft of the Interim Plan and its Paragraph 3, which was deleted from the Final executed Plan, is thus misplaced. The omission of Paragraph 3 from the final, approved Interim Plan the only Plan actually approved and signed by all the parties was not a modification or retraction of any previously existing, binding, effective Interim Plan; it was, and is the only Interim Plan actually approved and executed by the parties.[17]
 
 
 28
 Even if the defendants did not expressly repudiate their obligations under the 1970 Agreement to construct Route K as a whole, the plaintiff seems to suggest that, in effect, the defendants, by their voluntary execution and implementation of the final Interim Plan, as approved and executed by the parties, made it impossible for them to perform their obligation to complete Route K as contemplated by the 1970 Agreement. This contention is predicated upon an assumption that the parties will never enter into another Plan to finance the construction of that part of Route K which was deferred in the Interim Plan, that they have indicated as much, and that the Interim Plan represents the final agreement of the parties to contribute to the construction of a Metrorail system for the Washington area. The flaw in this argument is that it does not square with the facts and the District Court recognized that this was the case. Thus, the Court conceded that "it is not conclusive that the interim capital contributions agreement is the final round of financing for the Metrorail construction." Indeed, the record, and especially action officially taken after the hearings in the District Court were concluded,[18] demonstrate that the parties are not only intending but are actually engaged in preparing plans for the further financing required for the completion of Route K, as well as certain other segments of the projected system which were deferred by the Interim Plan. Nor is there anything in the Interim Plan of 1977 as finally executed, which suggests even obliquely that the parties did not intend further financing in order to complete the system. Paragraph 3 of the proposed draft of the Interim Plan was disapproved simply because it was feared that such paragraph might be construed to have this effect. And it was to make perfectly clear and positive that the parties intended no abandonment of the plan to construct the full system, as outlined in ARS-68 (Revised), and no repudiation, in any particular, of the obligations assumed by them in the 1970 Agreement, that the parties excised from the final executed Interim Plan paragraph 3 of the earlier draft.
 
 
 29
 Moreover, it must be emphasized that the District Court never found that Route K would not be completed as contemplated under the 1970 Agreement. And the plaintiff emphasizes this in its brief in this appeal; in fact, it seems to take the position that such a finding was unnecessary in order to support an action to recover damages for an anticipatory breach of the Agreement. Yet the very essence of the plaintiff's right of action is that either the defendants have unequivocally repudiated any intention "at any time"[19] to construct such a system with Route K included or have so completely disqualified themselves voluntarily that they cannot construct such a system. Absent such a finding, the plaintiff's action for a total breach of the 1970 Agreement is premature.
 
 
 30
 As a matter of fact, the plaintiff seems during trial to have departed from the theory that the defendants had repudiated or abandoned any intention "at any time" of completing Route K and to have adopted the view that the defendants' failure to conform to two subsidiary provisions of the 1970 Agreement were sufficient to give the plaintiff a right of action for damages for total breach of that Agreement in advance of the time fixed in the Agreement for performance of the object which was the consideration bargained for by the plaintiff (I. e., the construction of Route K).
 
 
 31
 This is no more than an argument that, if one party to a contract violates any provision of a contract, whatever its materiality, such violation will represent an anticipatory breach, giving the other party the right to recover damages for the breach of the entire contract.[20] But this, as we have seen, is just what the doctrine of anticipatory breach does not authorize. The Courts and textwriters have repeatedly declared that an anticipatory breach cannot be predicated on a partial breach of the contract or on a breach which is not "of such substantial character as to defeat the object of the parties in making the contract."[21] Neither of the breaches relied on by the plaintiff and identified by the District Court as a basis for its findings will meet this test.
 
 
 32
 The failure to make the computations called for under Section 3.3(b) of the 1970 Agreement, which was the first of the omissions relied on by the plaintiff, was immaterial, so far as the accomplishment of the objective of that Agreement itself was concerned. The plaintiff argues, and the District Court seems to accept this argument, however, that, if the computations had been made beginning in 1974, followed by calls for contributions upon the local jurisdictions, there would have been no reason to defer the construction of Route K in 1976 and the Authority would have had adequate funds at that time for the completion of the project as planned under ARS-68 (Revised) when the Interim Plan was executed. The argument disregards the clearly established facts. The deferment of Route K was not caused by any delay on the part of the local jurisdictions in making their contributions to its costs. In fact, there was no basis on which such computation could have been intelligently made in 1974 or 1975. The amount and timing of such contributions depended on the availability of the federal share of the construction costs. The federal government's share of the costs for completing the project, it is true, had been increased, during the progress of the project, from two-thirds to four-fifths but the federal appropriation for the project was, as a practical matter, exhausted. Any additional federal funds required for the federal share of the construction costs, could only be secured by transfers from the highway trust fund. Such transfers required the authorization of the Secretary of Transportation. The Secretary of Transportation, however, was unwilling to authorize such transfers until an alternatives study had been prepared and submitted in connection with the completion of Route K beyond Glebe Road and of four other routes. It would accordingly have been an entirely futile exercise to compute and demand contributions from local jurisdictions until the Authority knew the federal contribution was available. Moreover, any computation prior to this knowledge would have been useless, since between its preparation and the time when the federal contribution might be assured, construction costs, interest charges, and demographic changes in the various parts of the zone to be served would have changed, invalidating completely any earlier computation of costs and anticipated revenue.
 
 
 33
 The second departure from the strict language of the 1970 Agreement, on which the plaintiff relies, is the provision which states that there shall be no revision, alteration or amendment altering the facilities to be constructed under ARS-68 (Revised) without the consent of the local jurisdiction to be served by the facility. The plaintiff contends the deferment in the construction of Route K beyond Glebe Road was not consented to by it and was therefore a violation of the above provision. Without tarrying to consider whether such deferment was a revision within the terms of the 1970 Agreement, the fact is the Authority had no choice but to defer at that time further construction beyond Glebe Road. In the first place, it could not have proceeded with construction beyond Glebe Road as contemplated under the express language of ARS-68 (Revised), whether it wished to or not. ARS-68 (Revised) provided specifically that from Glebe Road to Nutley Station the system should run along the median of Interstate 66.[22] But concededly, when the Interim Plan was formulated, the construction of Interstate 66 was enjoined under pending litigation. Certainly, under those circumstances, the Authority could not be expected to stop all construction simply because, in the absence of the necessary right-of-way, it could not at the moment proceed with construction of Route K beyond Glebe Road. The Interim Plan was no more than a reasonable solution for what the parties assumed and hoped was merely a temporary problem, which in time would be solved. Subsequent events have shown that this assumption was sound, since construction of Interstate 66 appears now to have surmounted all legal challenges. In addition, the federal government refused at the time the Interim Plan was agreed upon to advance any funds for construction of Route K beyond Glebe Road until after an alternatives study had been concluded. Again, it would have been unreasonable to expect all construction on other parts of the system, for which adequate financing was available, to be deferred until the alternatives study had been concluded and considered by the Secretary. But the important fact is that, despite these tentative roadblocks, the defendants have aggressively pressed on with plans for the construction of the system along Route K beyond Glebe Road. They have completed the alternatives study and have reaffirmed their commitment to the completion of Route K. They are even now engaged in the preparation of a contribution and construction schedule for the project. The defendants are confident that within the time provided for the completion of the system Route K beyond Glebe Road will be constructed. The District Court recognized this. Under such circumstances, it cannot be said the defendants have repudiated the real objective of the 1970 Agreement or abandoned the firm intention to complete the construction of a 100-mile Metro system for the Washington area. There has thus been no anticipatory breach of that Agreement by the defendants, authorizing a suit to recover damages for such "total breach." The findings of the District Court to the contrary were clearly erroneous.[23]
 
 
 34
 The judgment of the District Court is accordingly vacated, with directions to dismiss the action of the plaintiff as premature, without prejudice to plaintiff's right, if it develops that the defendants have unequivocally abandoned hope of constructing Route K beyond Glebe Road, as provided in the 1970 Agreement, or if Route K is not completed within the time fixed for the completion of the system in the 1970 Agreement, to file such other actions as may then be appropriate.
 
 
 35
 REVERSED.
 
 
 
 [1]
 The City of Fairfax refused to agree because of the absence of any provision for the complete construction of Route K in the proposed Plan. Finally, in order to proceed with those portions of the system then available for construction, it was agreed to eliminate the City of Fairfax as a signatory of the Plan
 
 
 [2]
 Marr Enterprises, Inc. v. Lewis Refrigeration Co. (9th Cir. 1977) 556 F.2d 951, 956; Terry, Book Review, 34 Harv.L.Rev. 891, 894 (1921)
 
 
 [3]
 Dingley v. Oler (1886) 117 U.S. 490, 502, 6 S.Ct. 850, 29 L.Ed. 984; Roehm v. Horst (1900) 178 U.S. 1, 8-13, 20 S.Ct. 780, 44 L.Ed. 953; McJunkin Corp. v. North Carolina Natural Gas Corp. (4th Cir. 1961) 300 F.2d 794, 801, Cert. den. 371 U.S. 830, 83 S.Ct. 43, 9 L.Ed.2d 68 (1962); Suburban Improvement Co. v. Scott Lumber Co. (4th Cir. 1933) 67 F.2d 335, 337, Cert. denied 287 U.S. 660, 53 S.Ct. 123, 77 L.Ed. 569, 90 A.L.R. 330; Johnson v. McKee Baking Company (W.D.Va.1975) 398 F.Supp. 201, 205, Aff'd 532 F.2d 750; Matzelle v. Pratt (E.D.Va.1971) 332 F.Supp. 1010, 1012
 
 
 [4]
 Sternheimer v. Sternheimer (1967) 208 Va. 89, 155 S.E.2d 41, 47; Greenbrier Farms v. Clarke (1952) 193 Va. 891, 71 S.E.2d 167, 171; Simpson v. Scott (1949) 189 Va. 392, 53 S.E.2d 21, 24
 
 
 [5]
 Harrell v. Sea Colony, Inc. (1977) 35 Md.App. 300, 370 A.2d 119, 123-124; Weiss v. Sheet Metal Fabricators (1955) 206 Md. 195, 110 A.2d 671, 674-675; Speed v. Bailey (1927) 153 Md. 655, 139 A. 534, 537
 
 
 [6]
 Restatement of Contracts, § 318 (1932)
 
 
 [7]
 Uniform Commercial Code, § 2-610; Comment, Anticipatory Repudiation Under the Uniform Commercial Code: Interpretation, Analysis, and Problems, 30 Sw.L.J. 601 (1976)
 
 
 [8]
 Suburban Improvement Co. v. Scott Lumber Co., Supra, at 337 of 67 F.2d
 
 
 [9]
 See, Also : Lumbermens Mutual Casualty Company v. Klotz (5th Cir. 1958) 251 F.2d 499, 504 ("To precipitate anticipatory breach, there must be a complete renunciation of the contract, a categorical claim that it has never been, or no longer is, valid and binding whatsoever.")
 For the distinction between the anticipatory breach giving rise to a cause of action for damages and an excuse for non-performance, See Guaranty Bank and Trust Company v. Reyna (1964) 51 Ill.App.2d 412, 201 N.E.2d 144, 150-151 (quoting from Williston, Contracts, §§ 1324, 1326 (Rev. ed. 1937)).
 
 
 [10]
 See also Dingley v. Oler, Supra, at 503 of 117 U.S., 6 S.Ct. 850
 
 
 [11]
 4 Corbin on Contracts, § 972, p. 901
 
 
 [12]
 Matzelle v. Pratt, Supra, at 1012 of 332 F.Supp., in which the Court said that where time was not of the essence, delay in performance "is simply not a material or substantial breach justifying rescission."
 
 
 [13]
 Matzelle v. Pratt, Supra, at 1012 of 332 F.Supp.; Campos v. Olson (9th Cir. 1957) 241 F.2d 661, 663
 
 
 [14]
 Kimel v. Missouri State Life Ins. Co. (10th Cir. 1923) 71 F.2d 921, 923
 
 
 [15]
 Sternheimer v. Sternheimer, Supra, at 47 of 155 S.E.2d
 
 
 [16]
 Thus, in Roehm v. Horst, the Court said:
 "It has always been the law that where a party deliberately incapacitates himself or renders performance of his contract impossible, his act amounts to an injury to the other party, which gives the other party a cause of action for breach of contract." (178 U.S. at 18, 20 S.Ct. at 787)
 See also Johnson v. McKee Baking Co., Supra at 205 of 398 F.Supp.; Tobriner v. Mayfair Extension Incorporated (D.C.D.C.1966) 250 F.Supp. 614, 617-618, Aff'd. 382 F.2d 475; Keep Productions v. Arlington Park Towers (1977) 49 Ill.App.3d 258, 7 Ill.Dec. 648, 653, 364 N.E.2d 939, 944.
 In the Restatement Three situations are listed which will constitute an anticipatory repudiation:
 "(a) a positive statement to the promisee or other person having a right under the contract, indicating that the promisor will not or cannot substantially perform his contractual duties; (b) transferring or contracting to transfer to a third person an interest in specific land, goods, or in any other thing essential for the substantial performance of his contractual duties; and (c) any voluntary affirmative act which renders substantial performance of his contractual duties impossible, or apparently impossible." § 318.
 
 
 [17]
 The plaintiff's attempt to convert the initial draft of the Interim Plan, considered by the Authority at its Board meeting on December 2, into the real agreement of the parties and the subsequent disapproval of that proposed Plan and drafting of a different Plan, which was the only Plan approved and executed by the parties, into a retraction of the provisions of an earlier valid and binding Plan, assumed to have been executed on December 2, is no more than a fanciful attempt to conjure up a factual situation to fit an imagined theory of an invalid retraction of an earlier unequivocal repudiation of the 1970 Agreement. The law relied on for this faulty theory is sound (4 Corbin on Contracts, § 980 at p. 931 (1951 ed.)) but the facts in this case simply don't jibe with the theory
 
 
 [18]
 This is evidenced by the alternatives study, as officially conducted, which the defendants have requested us to notice. On the other hand, the plaintiff has asked us to take notice of a letter written by the Secretary of Transportation under date November 21, 1977. This letter the plaintiff takes as a flat statement that the federal government will not make its required contribution for the completion of Route K. We do not so read the Secretary's letter. Expressing his personal commitment to the project, he said that federal funding should await the completion of the alternatives study and an establishment of priorities by the defendants. He suggested that the available federal funds would be allocated after consideration of the alternatives study and the priorities recommended by the defendants. The alternatives study suggests that Route K will be given consideration for federal funding when the Secretary reviews that study. There is no reason at this point to assume that such review will not be favorable to the completion of Route K
 
 
 [19]
 Dingley v. Oler, Supra, at 502 of 117 U.S., 6 S.Ct. 850
 
 
 [20]
 This is not to say that, if the plaintiff can show damages, it may not recover at once for a partial breach of a contract but, and this is the important fact so far as this action for a total breach is concerned, He cannot recover for the anticipatory breach of the entire contract unless, as we have said, the partial breach is so substantial and material that it renders impossible the later performance of the primary object of the agreement. See 4 Corbin on Contracts, § 972 at pp. 900-901; N.Y. Life Ins. Co. v. Viglas (1936) 297 U.S. 672, 681-682, 56 S.Ct. 615, 80 L.Ed. 971. So far as we can see, plaintiff suffered no damage from the failure of the defendants to comply punctually with the two provisions relied on by it for its claim of a total breach. It is unnecessary for us to decide this, however, since the plaintiff is seeking to recover for the total breach of the 1970 Agreement and not damages for the breach of some subsidiary provisions
 
 
 [21]
 See authorities cited in notes 13, 14 and 15
 
 
 [22]
 The District Court found that "(t)he completion of I-66 was not included in the 1970 capital contributions agreement It was not even mentioned." However, the ARS-68 (Revised) plainly provides that Route K was to be built in the I-66 median. Thus, it states that "(t)he route (Route K) continues in subway under Fairfax Drive to a point west of Glebe Road where it enters the median of the proposed Interstate Route 66. The route continues westward on the surface of the median of Interstate Route 66 to a terminal at Nutley Road." This provision, along with all other terms of ARS-68 (Revised) is incorporated by reference into the 1970 Agreement by Section 2.1 of that Agreement. The District Court is thus in error in dismissing the linking of the completion of Interstate 66 to the completion of Route K
 Actually, the designs of Interstate 66 have consistently included a provision for the use of the median for the K-line. As originally designed, this highway was to include four lanes in each direction with the K-line operating down the median. Recently, Interstate 66 has been redesigned to consist of only two lanes in each direction, with the K-line operating down the median. The reduction in the lanes was based on the confident assumption that the K-line would be built and that an Interstate 66 with less lanes for motor traffic would encourage commuters to use the K-line rather than Interstate 66. Thus, there is complete integration of the two projects the K-line and Interstate 66 and strong evidence both of the intention that the K-line shall be built and of the necessity that such line be built.
 
 
 [23]
 The defendants raised other claims of error in the decision of the District Court. Since we find the absence of an anticipatory breach, as that term is defined in the law of contracts, it is unnecessary to consider these other claims