## Richmond

NATHAN STERNHEIMER, ET AL. v. LEWIS STERNHEIMER, INDIVIDUALLY AND AS EXECUTOR, ETC., ET AL.

LEWIS STERNHEIMER, INDIVIDUALLY AND AS EXECUTOR, ETC. v. STERNHEIMER BROS., INCORPORATED, ET AL.

June 12, 1967.

Record Nos. 6391, 6392.

Present, All the Justices.

*LeRoy R. Cohen, Jr. (Cohen, Kelly & Abeloff*, on brief), for appellants.

*Morton L. Wallerstein; Alan G. Fleischer* (*Wallerstein, Goode, Adamson* and *Dobbins; Hirschler* and *Fleischer*, on brief), for appellees.

BUCHANAN, J., delivered the opinion of the court.

We are concerned here with two appeals from one decree, entered on July 27, 1965, in a suit brought by Lewis Sternheimer, individually and as executor of the estate of his father, Fred Sternheimer, against Sternheimer Bros., Incorporated, and individuals interested in that corporation.

The seed from which this litigation has developed was an agreement dated January 17, 1930, between Fred Sternheimer and his brother Nathan, executed also by the wife of each. This agreement stated that the two brothers had for many years conducted the firm of Sternheimer Bros. (engaged in the the mercantile business); that they had recently incorporated and received stock for their interests, and had agreed that the interest of each should pass at death to the survivor. Accordingly, each had agreed to sell to the other his entire stock at $2 per share effective at the death of the seller, regardless of the then market value of the stock, the intent being that the surviving party should own the corporation.

On December 29, 1947, the same parties, together with Lewis Sternheimer, son of Fred, and Mark Sternheimer, son of Nathan, by guardian, entered into another agreement, which is the main matter of controversy in this litigation. It recited that of 480 shares of Class A stock (entitled to vote), Fred and Nathan each owned 240 shares, and of 120 shares of Class B stock (not entitled to vote), 60 shares were owned by Lewis and 60 shares by Mark; that by reason of changing circumstances the parties to the 1930 agreement were of opinion that it did not now carry out their original purpose, which was to provide for the continuity of management of the corporation by the male members of the Sternheimer families. Accordingly, the parties to the contract did "mutually undertake and agree" as set out in ten separate "Articles." These agreements relevant to the issues in this litigation are set out in the footnote.*

---

\* The agreement of January 17, 1930, is void and of no effect.

The salary of Nathan as secretary and treasurer shall be 90% of the salary of Fred as president, retroactive to January 1, 1947, and thereafter the salary of

This 1947 agreement was amended by an agreement dated December 27, 1949, executed by the named four and by the wife of Fred and the wife of Nathan. It recited that Fred had resigned as president effective December 27, 1949, when Nathan would become president, and the parties desired that Lewis then become secretary and treasurer of the company. It was so agreed, and further agreed that eighteen months after the time Mark became actively engaged in the business Lewis would resign as secretary or treasurer and Mark succeed to the office so vacated; and when Fred and Nathan both ceased to be actively engaged in the management of the business, the offices to be held by Lewis and Mark should be as provided in the 1947 agreement.

It was further agreed that the salaries of all officers shall be determined anew by the board of directors at meetings to be held on the third Tuesday in each March; that the salary of Nathan as president shall be at the rate of $21,000 per annum from January 1, 1950, to March 20, 1951, and the salary of Lewis as secretary and treasurer at the rate of $5,200 per annum for the same period. No salary

---

neither shall be less than 90% of the salary of the other so long as they hold one or more of the named offices in the company.

All stock of the company shall be owned and held subject to the terms and conditions of this agreement; and limitations upon the right to sell or transfer any of the Class A stock and Class B stock are set out in detail.

So long as Fred or Nathan remains actively engaged in the management of the business, Lewis and Mark shall receive salaries as described when they become actively engaged in the business, and when the last of Fred and Nathan ceases to be actively engaged in the management of the business, if Lewis and Mark are then actively engaged in the business, the one so engaged the longest shall be elected president, to serve for three years, and the other shall be elected secretary and treasurer, and these offices shall alternate between the two so long as they are actively engaged in the business, and they shall receive salaries as provided.

Fred shall continue as president until his death or until he reaches seventy-one years of age, or retires or resigns; and Nathan shall then become president and continue in that office until his death, or until he becomes seventy-one years old, or retires or resigns.

When the first of Fred or Nathan retires from the business of the company, the office of chairman of the board of directors shall be created, and the one retiring shall thereupon be appointed to such office for life and "receive as compensation for his services as such" an amount equal to 60% of the salary of the president.

Lewis and Mark shall be deemed to be actively engaged in the management of the business so long as they are discharging the duties of an office; and shall be deemed to be actively engaged in the business so long as they are discharging the usual and ordinary duties of any job, position or office in the employ of the company.

This agreement may be amended or revoked only by the consent of Fred, Nathan, Lewis and Mark, or upon the death of one or more, by the unanimous consent of the survivors.

shall be payable solely because an officer shall hold title to an office, except the chairman of the board shall receive, "as compensation for services as such," an amount equal to 60% of the salary of the president. Additional provisions are made as to salaries, and the concluding provision is that except as so amended all the terms and conditions of the December 29, 1947, agreement are ratified, approved and confirmed.

A further agreement dated October 11, 1954, recited that Fred had died on September 14, 1953, and that Nathan had exercised the option given by the 1947 agreement and had purchased from Lewis 40 shares of Class B stock, and that Lewis had the option to repurchase same within two years from the death of Nathan; and the agreement provided the method of ascertaining the price Lewis should pay; and the terms of the 1947 agreement, as amended, were again ratified, approved and confirmed.

In May, 1964, Lewis Sternheimer brought this suit in equity and stated in his bill that he was the owner of 240 shares of Class A voting stock and 20 shares of Class B non-voting stock; that Nathan owned 240 shares of Class A and 40 shares of Class B; and that Mark owned 60 shares of Class B; that Fred Sternheimer resigned as president of the company effective December 27, 1949, and was chairman of the board according to the 1947 contract until his death on September 14, 1953.

The bill alleged that Mark had become actively engaged in the business on March 8, 1954, and on September 8, 1955, complainant, Lewis, resigned as treasurer of the company and Mark was elected to that office; that notwithstanding his employment by and his office in the company, Mark had engaged in another business named Alden Sales Company, to which he was devoting substantial amounts of time and was receiving substantial profit, to the detriment of his service to Sternheimers.

Complainant further alleged that Nathan Sternheimer became seventy-one years old on November 15, 1963, and pursuant to the 1947 agreement, as amended, as well as the minutes of the board of directors, he was to cease to engage in the active management of the business and Lewis was to become president of the company; that accordingly complainant, as secretary of the company, called meetinge of the stockholders and directors to carry out the provisions of the 1947 contract, as amended, but that Nathan and his wife Hazel deliberately absented themselves from the meetings for the purpose of defeating provisions of the contract.

It was further alleged that the 1930 agreement was invalid and unenforceable and that there had been a complete failure of consideration for the 1947 agreement.

The prayers of the bill were that the court adjudge that complainant had the right either to have the 1947 agreement specifically enforced or to have it rescinded; that the court adjudge and declare what would be the rights and obligations of the complainant, individually and as executor, if he should elect to rescind the 1947 agreement, and especially whether the 1930 agreement or any other rights and obligations affecting complainant individually or as executor would be thereby revived; and that after, but not before, the court has so adjudged, the complainant may be permitted to elect whether to have the 1947 agreement enforced or to have the same rescinded.

Defendants Nathan, Hazel, Mark and Sternheimer Bros., Incorporated, filed demurrers to the bill, mainly on the ground that complainant merely sought to have an advisory opinion. The demurrers were sustained by order of July 31, 1964, with leave granted to tender an amended bill. On January 19, 1965, we refused an appeal from that order.

In the meantime, on August 20, 1964, the complainant filed an amended bill which adopted by reference the first twenty-five paragraphs of his original bill, which was all of it except paragraphs 26 and 27, which asserted a right of election, and the prayer. Paragraph 26 of the amended bill stated that because of the failure of Nathan, Hazel and Mark to carry out the terms of the 1947 agreement, complainant had the right either to have the same rescinded or to have it specifically enforced. After suggesting some possibilities of detriment from rescission, the complainant prayed:

(a) that he have discovery from Nathan, Hazel and Mark of any contract or obligations, other than the 1930 contract, which they claimed would be revived and enforceable upon rescission of the 1947 contract; (b) that complainant have rescission of the 1947 contract, but only on the conditions that neither the 1930 contract nor any other adversely affecting him or his father's estate would thereupon become enforceable, and that rescission would not change the board of directors of the company as now constituted; (c) that if the court determined that the complainant was not entitled to the relief prayed for in (b), then that the 1947 contract as amended be specifically enforced; (d) that if the court determined that complainant is entitled to the rescission specified in (b), then complainant prayed that Nathan, Mark and Hazel be required to do specified

things; and (e) if the court determined that the 1947 contract should be specifically enforced pursuant to (c), then complainant prays that he be adjudged to be the president of Sternheimers or entitled to be elected as such; that Mark be enjoined from engaging in other business and that Nathan be enjoined from engaging in the active management of the business.

Nathan, Hazel, Mark and Sternheimer Bros., Incorporated, filed demurrers to the amended bill which the court overruled. Nathan, Hazel and Mark then filed their answer admitting certain of the allegations and denying others. Responding to the request for discovery, they stated that there was no contract or obligation other than the contracts of 1930, 1947, 1949 and 1954.

The court then heard *ore tenus* the evidence of Lewis, Mark and three other witnesses, primarily on the subject of Mark's work in the company and in his other business.

Lewis testified that he was forty years old and had gone to work for Sternheimers in July, 1948. The company owned, he said, twenty-one retail A & N stores at different places in Virginia which engaged primarily in the retail business, selling work clothes mainly but also camping supplies and sporting goods. The main warehouse and office were in Richmond. They handled more than a million dollars worth of merchandise a year. Each store is under a manager and two or more clerks, and two supervisors are employed to travel around and supervise the stores. He, Lewis, spent most of his time at the office and since November 15, 1963, he had been in general charge of the business. He said he asked Nathan what Mark was supposed to be doing and Nathan replied, "he does what I tell him to do." After he had testified as to his activities at the office, he was asked where Mark spent his time. He replied that he would possibly be out at the stores, but he did not know where he spent his time.

He testified that the directors of the company are Nathan, Lewis, Hazel (wife of Nathan) and Virginia (mother of Lewis), two from each family.

He said that for the years 1956, 1957 and 1958, he, Lewis, was elected secretary of the corporation and Mark was elected treasurer. At the March, 1959, directors' meeting Mark's salary was fixed at $15,000 a year as long as he was discharging the duties of his office as provided by the 1947 contract as amended, and the same was continued for the years 1960-1964.

In November, 1963, Lewis requested the stockholders to adopt resolutions directing the board of directors to elect Mark secretary

and treasurer for three years with compensation the same as Lewis received. Lewis testified, however, that he could not say whether Mark was then "actively engaged in the business of the company."

Mark testified that he was thirty-five years old and began to work for Sternheimers in March, 1954, and had devoted all of his time to the company since then. He served as manager of one of the stores from 1954 to 1956 and afterwards as supervisor of stores. He continued in this and similar work after he was elected treasurer of the company. He described himself as an outside "trouble shooter," occupied primarily with training managers and taking inventories when managers were changed, which was frequent, he said. "I was really the only man from the management team—Nathan, myself and Lewis —that was really in the stores on a day to day basis doing this type of work." He had never been assigned any duties as treasurer of the company.

He testified that he was the owner of the business called Alden Sales Company, which he began in 1959, and it dealt principally in electronic equipment and small instruments of relatively high value. He considered it, he said, as an avocation and that he discussed it with Nathan and Lewis and they made no objection. It was a mail-order business, he said, and he did not devote time to it during the day.

However, there was evidence that the purchases of this business grew from $10,339.28 in 1959 to $47,986.03 in 1964; that its expenses increased in the same period from $1,854.19 to $6,758.07. Bank deposits increased during the same period from $15,405.40 to $253,371.01. The records showed that for the same period sales amounted to only $128,383.39. During that period Alden Sales paid Mark $88,340. The court asked Mark whether all the deposits were from sales of merchandise and he replied, "Emphatically no."

After thus hearing the evidence *ore tenus*, and for the reasons stated in two written opinions, the court decreed:

The evidence does not warrant an injunction restraining Mark from engaging in the business of Alden Sales.

Under the terms and provisions of the 1947 contract as amended, Nathan's term of office as president of the company ended when he became seventy-one years of age on November 15, 1963; that he is then deemed to have retired from the business of the company and became chairman of the board of directors for life, with no duties to perform, but was entitled to receive "as retirement income by

way of deferred salary payments a sum equal to 60% of the salary received by the then president of the corporation."

Although from and after November 15, 1963, Lewis was entitled to be president and Mark secretary-treasurer, neither had had a clear tenure thereof because of this controversy, hence the office of each, so long as he is performing the duties of his office, shall extend to the third Tuesday in March, 1968, the date fixed by the by-laws for the 1968 stockholders' meeting, when they shall exchange offices and thereafter alternate as provided by the contract.

The compensation of Nathan, Lewis and Mark from November 15, 1963, to the date of the decree is fixed on a *quantum meruit* basis at a rate of $21,891.90 annually. The salaries of the president and secretary-treasurer from the date of this decree shall be fixed by the board of directors at a meeting within thirty days from the decree.

Pursuant to the contract and the requirements of law, Lewis and Mark shall be elected from time to time as directors prior to and for a period of not less than their alternating terms of office.

Under assignments of error to this decree Lewis, individually and as executor, contends first that the court erred in failing to grant rescission of the 1947 contract as amended on the conditions that the 1930 agreement and no other contract adversely affecting the complainant would thereby be revived and become enforceable, and that rescission would not change the board of directors. These conditions were included in paragraphs (b) and (d) of the amended bill as set out above. In (b) complainant emphasized that he asked for rescission only on certain conditions. The grounds upon which complainant prayed for conditional rescission were failure of consideration on the part of Nathan, Hazel and Mark. The facts alleged in support of rescission were that Mark had devoted substantial amounts of time to Alden Sales to the detriment of his service to Sternheimers, and that Nathan and Hazel had deliberately absented themselves for the purpose of preventing a quorum at the board meeting called by Lewis for November 15, 1963, for the purpose of electing him president and Mark secretary-treasurer of the company and Nathan as chairman of the board as provided by the contract.

Nathan, Hazel and Mark asserted in their answer that the meeting was called to be held on Nathan's seventy-first birthday, as Lewis knew, and the reason he did not attend was that he had made arrangements to attend to some business for the company in Baltimore

on that day and to spend his birthday with his wife in Atlantic City. There was no evidence to dispute this assertion.

Mark denied that the business of Alden Sales interfered at all with his duties to Sternheimers and gave the testimony referred to above as to his services to the company, which was not refuted. In addition, Article VIII of the 1947 contract provided that Mark was actively engaged in the management of the business so long as he was discharging the duties of an office, and the minutes of the board of directors show that Mark was regularly elected treasurer of the company for the years 1961 and 1962. Mark testified that on November 15, 1963, Lewis called him into his office and said he was president; that Nathan was no longer engaged in the business; that Mark was now secretary-treasurer, and he wanted him to sign checks.

The court heard the evidence and concluded that it was not sufficient to show that "at this stage that what Mark has been doing and is now doing violates the spirit of this contract." We agree with that conclusion.

The contract itself does not by its terms require that the officers shall engage in no outside activities, nor does it do so by implication short of an activity detrimental to the affairs of the company.

[1] "Generally, it is held that the directors or officers of a corporation are not, by reason of the fiduciary relationship they bear toward the corporation and the stockholders thereof, precluded from entering into and engaging in a business enterprise independent from, though similar to, that conducted by the corporation itself, provided in doing so they act in good faith and do not interfere with the business enjoyed by the corporation." 19 Am. Jur. 2d, Corporations, § 1282, p. 690; Anno., 64 A.L.R. 782, 784.

Lewis apparently concurred in this view, as the evidence shows that in 1960 he organized a corporation called Civil War Products, Inc., for the purpose of selling Civil War and other relics and merchandise; and from 1954 through 1964 he engaged in stock market transactions amounting to more than a million dollars.

[2] "Generally, rescission and cancellation of a contract will not be given because of a partial failure of consideration, especially where there is no offer to restore the status quo as far as possible. Nonperformance must be total or substantial in order to justify rescission. * *" 16 Mich. Jur., Rescission, Cancellation and Reformation, § 15 at p. 147.

"Ordinarily, rescission will not be granted for breach of a contract which is not of such substantial character as to defeat the object of

the parties in making the contract, * *." *Bolling* v. *King Coal Theatres*, 185 Va. 991, 996, 41 S.E.2d 59, 62.

Since the evidence shows no breach of contract for which rescission should be granted, it is not necessary to discuss the alleged right of the complainant with respect to the conditions which he would attach to the right of rescission.

[3] While the attorney for Nathan and Hazel stated in the trial that "We are entirely in accord with the enforcement of that 1947 contract," and they say in their brief that the 1947 contract is valid and should be enforced, they assign error to the court's refusing to receive parol evidence relative to the 1947 contract; to stating that Nathan retired from the business when he became seventy-one, whereas the agreement provided only for his retirement from the active management of the business; in not admitting testimony to remove any ambiguity as to the powers and duties of the chairman of the board, and in stating in the decree that Nathan "was entitled to receive as retirement income by way of deferred salary payments" 60% of the salary of the president, when the contract provides that he shall receive that percentage as compensation for his services as such chairman.

Of these questions it is sufficient to say that there was no offer of parol evidence as to the contract, and nothing to indicate the character of such evidence. The contract provides that when Nathan becomes president of the company he shall continue while discharging his duties therein until he is seventy-one years old; and when he retires "from the business of the company" he becomes chairman of the board for life and shall receive "as compensation for his services as such," an amount equal to 60% of the president's salary. The contract is silent as to what his services may be. The provision that he shall "retire from the business" indicates that no services are expected of him. Certainly he is entitled to receive the compensation provided, regardless of whether he performs any service.

[4] While Sternheimer Bros. is a corporation, it and all of its officers and directors are bound by the terms of the 1947 contract as amended by the agreements of 1949 and 1954. They can make no arrangement as to its corporate officers and no provision as to succession of offices or other matters in conflict with the terms of said contract. Otherwise, it may contract and be contracted with and conduct its business in any and all ways permitted by law to business corporations generally. If the board of directors wish to assign duties not of a managerial nature to the chairman of the board, and he is

willing to do them, such procedure would not be prohibited by the contract.

Under the terms of the contract Lewis became president of the company on November 15, 1963, the date fixed by the contract for Nathan to retire. Also under the terms of the contract Lewis' tenure as president expired on November 15, 1966, and Mark then succeeded to that office for the term of three years, and Lewis to the office of secretary-treasurer. The amendment of 1949 provided that the salaries of all officers shall be determined anew for each salary period by the board of directors at a meeting to be held on the third Tuesday of March of each year. It follows that the provision of the decree extending the tenure of Lewis as president and Mark as secretary-treasurer to the third Tuesday in March, 1968, and fixing the compensation of Nathan, Lewis and Mark on a *quantum meruit* basis at the rate of $21,891.90, is contrary to the terms of the contract, which controls.

The decree appealed from is accordingly modified and the tenure of the president and of the secretary-treasurer from November 15, 1963, and the compensation of each, shall be as fixed by the terms of the 1949 amendment of the contract.

As so modified, the decree appealed from is affirmed.

*Modified and affirmed.*