BOYD, PAYNE, GATES & FARTHING, P.C., ET AL.

v.

PAYNE, GATES, FARTHING & RADD, P.C., ET AL.

Record No. 911939

November 6, 1992

Present: All the Justices

*R. D. McIlwaine, III (Peter W. Rowe; Janice McPherson Doxey; Stackhouse, Rowe & Smith*, on briefs), for appellants.
*Gregory N. Stillman (Benjamin V. Madison, III; Hunton & Williams*, on brief), for appellees.

CHIEF JUSTICE CARRICO delivered the opinion of the Court.

The question for decision in this case is whether law partners who form a professional corporation but who continue to conduct themselves as partners *inter sese* may yet have their rights and liabilities determined according to the law of partnership. The trial court

answered the question in the affirmative. We agree with the trial court and will affirm.

Effective January 1, 1977, Robert F. Boyd, Charles E. Payne, Ronald M. Gates, and Philip R. Farthing, who practiced law together in Norfolk, formed a professional corporation known as Boyd, Payne, Gates & Farthing, P.C. (Boyd P.C.). In 1983, Anthony F. Radd joined the practice. Then, in 1987, Payne, Gates, Farthing, and Radd left that practice and formed their own professional corporation under the name of Payne, Gates, Farthing & Radd, P.C. (Payne P.C.).

On November 29, 1988, Boyd P.C. filed a motion for declaratory judgment against Payne P.C. and Charles Payne, Ronald Gates, and Philip Farthing (collectively, the defendants). In the motion, Boyd P.C. alleged that the defendants had collected and deposited into ''a segregated interest-bearing account, monies in payment of [Boyd P.C.'s] accounts receivable.'' Boyd P.C. sought an order declaring that it was the owner of corporate assets consisting of accounts receivable, unearned professional liability insurance premiums, office furniture and equipment, and fiduciary fees.

Payne P.C. and the individual defendants filed an answer. In addition, the individual defendants filed a counterclaim and cross-bill against Boyd P.C. and Robert Boyd, individually, alleging that the professional corporation had been formed as a convenience to obtain certain tax and other benefits but that the law practice had been conducted as a partnership both before and after the corporation's formation. The trial court was requested to order an accounting and to require Boyd P.C. and Robert Boyd, individually, to ''pay to each of the other partners . . . their respective partnership percentages . . . of all partnership monies, funds, receivables, and assets.''

Boyd P.C. demurred to the counterclaim and cross-bill on the ground that it was ''a legal impossibility'' for a partnership and a corporation to coexist under the circumstances. After argument, the trial court overruled the demurrer.

By pretrial order, Anthony Radd was joined ''as a party defendant and counterclaimant.'' Thereafter, the trial court held a hearing to determine the nature of the entity that had been utilized to conduct the law practice.

In an order incorporating a letter opinion, the trial court held that while Boyd P.C. was, ''in organizational respects . . . a *de jure* professional law corporation,'' the corporation had not ''conducted or

controlled the law practice'' of the several lawyers involved and had been utilized solely as a tax shelter. Continuing, the court held that the law practice in which the parties engaged during the period from 1977 until the break-up in 1987 ''was conducted as a partnership in which the partners received annual salaries and shared in the profits.'' The court transferred the case to equity for a partnership accounting.

The trial court held an *ore tenus* hearing related to the winding up of the partnership. In its final decree, the court applied the ''partnership percentages'' and ordered Boyd P.C. and Robert F. Boyd, individually, to pay Charles Payne $119,443.95, Ronald Gates $97,727.45, Philip Farthing $83,247.66, and Anthony Radd $18,098.15, for a total of $318,517.21. From this decree, we awarded an appeal to Boyd P.C. and Robert Boyd (collectively, Boyd).

Viewed in the light most favorable to the defendants, the prevailing parties below, the evidence shows that in the mid-1950s, Robert Boyd formed a partnership with J. Randolph Davis, and they practiced together as Boyd and Davis. Charles Payne joined the firm as a salaried associate in 1969. In 1970, Boyd and Davis called Payne in and told him that he was ''going to be made a partner concurrently with [Davis's] retirement.'' The firm name was changed to Boyd, Davis & Payne, and Payne began receiving ten per cent of the profits. In a ''couple of years,'' Payne's percentage was increased to twenty percent, with Boyd receiving the remaining eighty percent.

Ronald Gates and Philip Farthing joined the firm as salaried associates in 1973 and were made profit-sharing partners effective January 1, 1977. Boyd's share of the profits was reduced to 60%, with Payne receiving 20% and Gates and Farthing 10% each. At the same time, the now four-member firm decided to form a professional corporation in order to obtain ''tax benefits and limited liability.'' An announcement prepared by Boyd was sent to ''all the clients and . . . the legal community.'' The announcement stated that Gates and Farthing had ''become partners'' and that ''the partnership [would] continue to practice'' under the new firm name of Boyd, Payne, Gates & Farthing, a professional corporation.

Stock in the professional corporation was issued to the four partners in the same percentages as their entitlement to profits, *viz.*, 60% to Boyd, 20% to Payne, 10% to Gates, and 10% to Farthing. This ratio of stock ownership did not change over the years and

remained the same at the time of the firm's break-up in 1987. However, the percentages of partner profit sharing varied from time to time. For example, when Anthony Radd was made a partner in 1983, he received no stock but began receiving five per cent of the profits.[1] At the same time, Boyd's share of the profits was reduced to 12% because of his lessened participation in the practice, with Payne receiving 33%, Gates 27%, and Farthing 23%. These percentages remained in effect until the 1987 break-up.

No formal partnership agreement existed during any of the periods in question and no partnership certificate was ever filed. However, tax returns described the law firm as a partnership and indicated that the members shared in losses as well as profits. Both before and after the corporation was formed, the members of the firm referred to each other as "partners" and to Boyd as the "managing partner." "Partner meetings" were held periodically during the year, and, in a year-end meeting, the "partners" discussed associate and staff bonuses and salaries, reviewed their own compensation and profit percentages for the next year, and decided other financial questions. After Radd became a partner, he participated in these meetings even though he owned no stock in the corporation.

Ronald Gates testified, and Payne and Farthing agreed with his testimony, that "[i]nternally" the firm "continued to operate [after incorporation] the way it had always . . . operated." Even the office manual, which designated Boyd as the "managing partner" and in several places referred to "the partners," went unchanged.

■ Further, as noted by the trial court, when the corporation was formed, the "partnership assets of the law practice were not merged into the corporation nor was any physical asset or receivable transferred to the corporation." Significantly, after the corporation was formed, the partners executed an agreement dealing with the possibility of a tax audit. The agreement provided that in the event of such an audit, "any tax liability . . . shall become the responsibility . . . of each partner . . . according to percentage of profits which he received in that particular year." Hence, the tax liability was apportioned on the basis of partnership percentages, not stock ownership.

Boyd contends on appeal that, at the time in question, "'an agreement among shareholders to disregard corporate law and function as a partnership was not permitted under Virginia law." Boyd points

---

[1] When Radd began sharing profits in 1983, an announcement was sent out informing "the legal community and clients and so forth that [he] was now a partner in the firm of Boyd, Payne, Gates & Farthing.'

out that the law applicable to professional corporations is contained in Chapter 7 of Title 13.1 of the Code, consisting of §§ 13.1-542 through -556, and that under § 13.1-553, "[a] professional corporation organized pursuant to [Chapter 7] shall be governed by a board of directors, which shall have the full management of the business and affairs of the corporation and continuing exclusive authority to make management decisions on its behalf."

Boyd then argues that the effect of the trial court's approval of the shareholder agreement in this case is "to do away with the board of directors entirely." Such a result, Boyd opines, is illegal. This position, Boyd says, is sustained by our decision in *Kaplan v. Block*, 183 Va. 327, 31 S.E.2d 893 (1944), and by the General Assembly's 1990 enactment of Code § 13.1-671.1.

*Kaplan* involved a corporation whose capital stock was divided into two classes, A and B. Class A, consisting of ten shares, carried no dividend rights but was the only voting stock. Class B, consisting of 120 shares, carried dividend rights but no voting power. The corporation's charter and by-laws provided that no act of the board of directors would be binding upon the corporation or the stockholders unless ratified by the unanimous vote of the holders of the Class A stock.

Block, who had been removed as a corporate officer by the board of directors, brought a mandamus action to regain his office, contending that his removal was violative of the charter and by-law provision. The trial court awarded mandamus. We reversed, holding that the charter and by-law provision was invalid because it divested the board of directors "of all power" and left it without authority "to do anything." *Id.* at 337, 31 S.E.2d at 897.

Boyd quotes the following excerpts from the *Kaplan* opinion:

Clearly the law does not permit the stockholders to create a sterilized board of directors.

*Id.* at 332, 31 S.E.2d at 895.

Under the charter and by-laws no action of the board of directors which is not approved by the stockholders is effective; and to make bad matters worse, it must not only be approved by them but must be unanimously approved by them. For all practical purposes there might as well be no board at all.

A private business corporation without a board of directors is an impossible concept.

Corporations were invented to circumvent the unity required in partnerships.

183 Va. at 335, 31 S.E.2d at 896.

These regulations, if followed out, violate both common and statute law and are suicidal of corporate existence. A board of directors whose every act must be endorsed by every stockholder is no board at all.

*Id.* at 336, 31 S.E.2d at 897.

■ We think *Kaplan* is inapposite. No charter or by-law provision "sterilizes" the board of directors here, and the coexistence of the partnership did not have the effect, as Boyd contends, of doing "away with the board of directors entirely." The board still had the authority, and was free, notwithstanding the existence of the partnership, to act as the directors deemed appropriate.

And the board did act. It elected officers at each annual meeting between 1977, when the corporation was formed, and 1987, when the law firm was disbanded. By use of unanimous consent resolutions, the board selected and authorized the implementation of plans for "certain tax and other benefits," including health-care and life insurance programs; it also authorized the lease of a Cadillac automobile and the opening of accounts with banks and investment firms, as well as a savings and loan association.

■ It is obvious, of course, that these actions of the directors were limited in scope, designed for the most part to promote the purpose for which the corporation was formed—to provide a tax shelter for the law practice. But *Kaplan* itself recognizes that not all limitations upon the powers of directors are illegal. Indeed, we said: "No one contends that limitations may not be placed upon the power of directors, but they cannot be legislated out of office." 183 Va. at 336, 31 S.E.2d at 897. We do not think the circumstances of this case justify a holding that the directors were "legislated out of office" by the continuation of the partnership after the corporation was formed.

Furthermore, in *Kaplan*, this Court cited *Sterling v. Trust Co.*, 149 Va. 867, 141 S.E. 856 (1928), in support of its holding that the charter and by-law provision under review was illegal. In *Sterling*,

the secretary-treasurer and general manager of a corporation, who was also a principal shareholder, undertook to purchase certain real estate without the knowledge of the president, who was the corporation's largest shareholder and who, upon learning of the purchase, refused to approve it. This Court held the transaction invalid because only the board of directors had the authority to make, or to authorize, the purchase. But in our discussion of the matter, we recognized that binding corporate action can arise in other ways:

> "It may arise by a long course of dealing which estops the corporation from denying the legality of that mode of dealing, or by the corporation acquiescing, or by its accepting the benefits of the transaction, or by practically all of the stockholders assenting."

149 Va. at 880-81, 141 S.E. at 859-60 (quoting William W. Cook, *Corporations* § 709, at 2918-19 (8th ed. 1923)).

■ Here, the course of dealing which was followed over a period of ten years estops Robert Boyd and Boyd P.C. from denying the existence of the partnership and the legality of the actions taken in that relationship. Moreover, all the shareholders, including Robert Boyd, assented to the actions about which he now complains. Neither of these factors was present in *Kaplan*, so the exception recognized there, rather than the direct holding, is applicable here.

Boyd argues, however, that prior to the General Assembly's 1990 enactment of Code § 13.1-671.1, "Virginia law did not authorize a Virginia court to treat a de jure professional law corporation . . . as a partnership." Section 13.1-671.1 reads in pertinent part as follows:

> A. An agreement among the shareholders of a corporation that complies with this section is effective among the shareholders and the corporation, even though it is inconsistent with one or more other provisions of this chapter in that it:

> 1. Eliminates the board of directors or restricts the discretion or powers of the board of directors;

> 2. Governs the authorization or making of distributions, whether or not in proportion to ownership of shares . . . ;

3. Establishes who shall be directors or officers of the corporation, or their terms of office or manner of selection or removal;

. . . .

5. Establishes the terms and conditions of any agreement for the transfer or use of property or the provision of services between the corporation and any shareholder, director, officer or employee of the corporation, or among any of them;

. . . .

B. An agreement authorized by this section shall be:

. . . .

[1.](b) Set forth in a written agreement that is signed by all persons who are shareholders at the time of the agreement;

2. Subject to amendment only by all persons who are shareholders at the time of the amendment, unless the agreement provides otherwise; and

3. Valid for ten years, unless the agreement provides otherwise.

. . . .

D. An agreement authorized by this section shall cease to be effective when the corporation has more than thirty-five shareholders of record.

. . . .

F. The existence or performance of an agreement authorized by this section shall not be a ground for imposing personal liability on any shareholder for the acts or debts of the corporation even if the agreement or its performance treats the corporation as if it were a partnership or results in failure to observe

the corporate formalities otherwise applicable to the matters governed by the agreement.

Citing *Richmond v. Sutherland*, 114 Va. 688, 693, 77 S.E. 470, 472 (1913), and *Wisniewski v. Johnson*, 223 Va. 141, 144, 286 S.E.2d 223, 224-25 (1982), Boyd argues that when the General Assembly adopts an amendatory act, it is presumed that a change in law is intended. Hence, Boyd concludes, the 1990 enactment of Code § 13.1-671.1 "was intended by the General Assembly to change existing law by making provision for something which did not theretofore exist."[2]

■ We disagree with Boyd. While Code § 13.1-671.1 doubtless contains features new to Virginia law, for example, the 35-shareholder cap, several provisions pertinent to resolution of the present dispute have long been part of the common law of this Commonwealth. To that extent, at least, the enactment of Code § 13.1-671.1 merely codified existing law, as enunciated in a number of this Court's pre-1990 decisions.

First of all, as noted *supra*, paragraph (1) of Code § 13.1-671.1(A) authorizes a shareholder agreement which "[e]liminates the board of directors or restricts the discretion or powers of the board of directors." In *Sternheimer v. Sternheimer*, 208 Va. 89, 155 S.E.2d 41 (1967), shareholders of a family owned corporation, in a 1947 contract, agreed on the family members who were to hold office, how long they should serve, and what compensation they should receive—a contract which clearly restricted the discretion and powers of the board of directors. Yet, this Court upheld the agreement, stating that the corporation "and all of its officers and directors are bound by the terms of the 1947 contract." *Id.* at 98, 155 S.E.2d at 48.

Next, Paragraph 2 of Code § 13.1-671.1(A) permits a shareholder agreement which "[g]overns the authorization or making of distributions, whether or not in proportion to ownership of shares." In *Drewry-Hughes Co. v. Throckmorton*, 120 Va. 859, 92 S.E. 818 (1917), a shareholder agreement prescribed how assets should be distributed upon dissolution of the corporation. This Court upheld the agreement, stating that such a stipulation, "so long as [it does] not infringe upon the rights of the public or of . . . creditors and

---

[2] Boyd states on brief that Code § 13.1-671.1 is taken "almost verbatim" from § 7.32 of the Model Business Corporation Act of the American Bar Association.

those dealing with it, . . . is permissive and valid." *Id.* at 865, 92 S.E. at 819.

Further, Paragraph 3 of Code § 13.1-671.1(A) allows a shareholder agreement which "[e]stablishes who shall be directors or officers of the corporation, or their terms of office or manner of selection or removal." Here again, we refer to *Sternheimer*. The factors now listed in Paragraph 3 of Code § 13.1-671.1 as permitted subjects of a shareholders' agreement were contained in the agreement validated in *Sternheimer*.

Also, Paragraph 5 of Code § 13.1-671.1(A) permits a shareholder agreement which "[e]stablishes the terms and conditions of any agreement for . . . the provision of services between the corporation and any shareholder, director, officer or employee of the corporation." In *Brewer v. Bank of Danville*, 202 Va. 807, 120 S.E.2d 273 (1961), we considered just such an agreement. There, the president and sole shareholder of a closely held family corporation, which she formed in 1940, received a salary of $40.00 per week. Fifteen years later, she agreed to sell her stock to her son and son-in-law, who managed the business. In return for relinquishing all her interest in the corporation as well as her positions as president and director, the son and son-in-law agreed, "as operators" of the company, to pay her at least $40.00 per week for life.

■ This Court upheld the agreement as the obligation of the corporation. We said that "where there is a family, or close corporation, . . . in which the stockholders, officers and directors ignore the requirements of the statutes and corporate by-laws, and conduct [the] business in an informal manner, the actions so taken may, nonetheless, be binding upon the corporation." *Id.* at 812-13, 120 S.E.2d at 278.

■ Finally, and of special pertinence here, subsection F of Code § 13.1-671.1 recognizes the validity of a shareholder agreement which "treats the corporation as if it were a partnership." But this is not a novel proposition in Virginia. Indeed, in a case decided more than a half-century ago, this Court treated as a partnership an arrangement entered into by the shareholders of a corporation.

*Deeds v. Gilmer*, 162 Va. 157, 174 S.E. 37 (1934), involved a dispute among creditors. In the late 1920s, A. E. Boger and T. C. Coleman entered into a partnership for the purpose of manufacturing and selling radio cabinets, with the understanding that a corporation, to be known as B. C. Sales Company, Inc., would be formed to carry out the purpose. About the same time, Boger obtained a

contract from Pulaski Veneer Corporation whereby he would be paid commissions for selling the company's products. Boger agreed with Coleman that he would assign his Pulaski contract to B. C. Sales Company, Inc. and that Coleman would share equally in the commissions received from Pulaski.

B. C. Sales Company, Inc. was chartered, but no stock was ever issued, and no capital was paid into the corporation. The corporation did keep a set of books, and the commission account with Pulaski was carried in the name of B. C. Sales Company, Inc. A fund amounting to $17,791.78 was paid into court by Pulaski as the amount of commissions due B. C. Sales Company, Inc. at the time litigation erupted.

In determining what amounts creditors should receive from the fund, a major issue was whether B. C. Sales Company, Inc. should be treated as a corporation or as a partnership. This Court decided that, in settling the company's accounts, B. C. Sales Company, Inc. should be "treated as a partnership composed of Coleman and Boger." 162 Va. at 277, 174 S.E. at 85. In the course of our opinion, we stated:

> B. C. Sales Company, Inc., became technically a corporate entity; and as such was capable of contracting and being contracted with, of taking and holding the assignment of Boger's contract with Pulaski Veneer Corporation, and of suing and being sued. But the evidence shows beyond all question that Boger and Coleman have been at all times the beneficial owners in equal parts of all its capital stock and/or of all rights to subscribe therefor; and that they have consistently, utterly disregarded its corporate entity, and dealt with its rights, property and business as if they belonged to a partnership composed of themselves. In view of this, as between themselves and as between one of them and the creditors of the other, they should not be heard to say that . . . it is other than a partnership composed of themselves doing business under the name and style of B. C. Sales Company, Inc. . . .
>
> [F]or all the purposes of this cause we shall so treat it and deal with it and its property.

*Id.* at 258-59, 174 S.E. at 77.

■ Because Boyd P.C. was a close corporation and its shareholders validly conducted the internal affairs of their law practice as a partnership, we hold that the trial court properly settled their rights and liabilities according to partnership law. Accordingly, we will affirm the court's final decree.

*Affirmed.*