**ELITE ENTERTAINMENT, INC. et al., Plaintiffs,**

v.

**KHELA BROTHERS ENTERTAINMENT INC, et al. Defendants.**

**No. 1:04CV764.**

United States District Court, E.D. Virginia, Alexandria Division.

Oct. 19, 2005.

Rajesh Bhandari, Sharma & Bhandari, Annandale, VA, for Plaintiffs.

Robert Powel Trout, Trout Cacheris PLLC, Washington, DC.

Lowry Jock Miller, Cyron & Miller LLP, Alexandria, VA, for Defendants.

Jagroop Singh Khela, Selma, CA, pro se.

## *MEMORANDUM OPINION*

ELLIS, District Judge.

This breach of contract diversity action arises out of a dispute between Elite Entertainment ("Elite") and Khela Brothers Entertainment ("Khela Brothers") regarding the promotion of two concert tours in the United Kingdom in 2004. These concerts, commonly known as "Bollywood" performances, are popular with the expatriate Indian populations in Europe and the United States, as they feature well-known entertainers from India and neighboring countries. Specifically, the parties disagree on the terms of the contracts they reached to promote (i) an April 2004 con-

cert tour in the United Kingdom featuring Hrithik Roshan and Aishwarya Rai; and (ii) a July 2004 concert tour, also in the United Kingdom, but featuring headliner Sharuk Khan, a.k.a. "SRK." Roshan, Rai, and SRK are among the most popular Bollywood entertainers in the world. Although both parties agree they entered into contracts to promote the tours in question, they differ sharply on the terms of these contracts, and each alleges the other party breached the contracts. Elite has sued Khela Brothers for breach of the contracts it claims were agreed to, and Khela Brothers has counterclaimed for breach of the contracts it contends were reached. Accordingly, the issues are (i) whether the parties entered into contracts for the two tours in question; and if so, (ii) what the terms of the contracts were; (iii) whether any contract was breached; and (iv) what damages, if any, resulted from the breaches.

Plaintiff Elite is a Virginia corporation with its principal place of business in Fairfax, Virginia. Defendant Khela Brothers is a California corporation with its principal place of business in Fresno, California. Individual defendants Jagroop and Daljeet Khela are both citizens of California. As the parties agree, subject matter jurisdiction is proper under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties, and because the amount in controversy far exceeds the $75,000 jurisdictional minimum. The parties also agree that venue is proper pursuant to 28 U.S.C. § 1391(a).

## II. FINDINGS OF FACT [1]

1. In 1993, Vijay Taneja ("Taneja") formed Elite, a Virginia corporation with its principal place of business in Fairfax, Virginia. Through Elite, Taneja has promoted and produced 19 Bollywood tours, or approximately 200 shows. In the Bollywood concert promotion business, there is typically an international promoter and a local promoter. Since 1997, Taneja, through Elite, has served as the international promoter on 13 Bollywood tours. Thus, Taneja is an experienced international promoter of Bollywood shows.

2. The division of duties and responsibilities between international and local promoters in the Bollywood concert business is a well established custom and practice. The responsibilities of an international promoter typically include (i) recruiting and signing the performers; (ii) organizing and paying for all international promotion of the tour; (iii) hiring and paying the tour's show director and choreographer and their staffs; (iv) paying the performers the negotiated appearance fee; and (v) scheduling and coordinating the concert dates for the tour. Typically, once the performers have been signed, the international promoter contracts with a local promoter to sell the local promotion rights for individual shows for a flat fee. On some occasions, however, the international promoter may sell these rights before the contracts between the international promoter and the performers have been finalized.

3. Local promoters are responsible for arranging and financing all remaining logistics of the show, including, *inter alia*, (i) arranging local marketing; (ii) setting ticket prices; (iii) reserving and paying for

---

1. The facts recited here are those found, pursuant to Rule 52, Fed.R.Civ.P., from the record as a whole, resulting from a four day bench trial during which twelve witnesses testified. Plaintiff presented one fact witness, Vijay Taneja, and one expert witness, Gerald Richards. Defendants presented ten fact witnesses, Jagroop Khela, Sean Sidu–Brar, Deepak Kumar, Avnish Agnihotri, Harpal Singh, Paramjit Gill, Tejinder Randhawa, Jagmeet Singh, Rashpal Palmal, and Daljeet Khela.

the performance venue; and (iv) paying performers a stipend for incidental expenses incurred while on tour, such as food and lodging. Local promoters typically assume the risk that the show will succeed in that locality. For their efforts, they are entitled to the net proceeds generated by the show in that locality after the international promoter's fee and all local expenses have been paid.

4. On some occasions, the international promoter may contact a local venue directly to reserve or book the venue for a particular show to ensure that the tour dates and locations are reserved in advance and coincide with the performers' schedules and availability. This may occur where the venues must be reserved before a local promoter is identified. In the event the international promoter advances expenses the local promoter is obligated to pay, the local promoter must reimburse the international promoter for these expenses.

5. Jagroop Khela is an engineer employed by the California Environmental Protection Agency, and Daljeet Khela (a.k.a.Mintu) works as a loan officer in California. Both Khelas are residents of California. In 2003, the Khelas, who have known Taneja since 2000, expressed to Taneja their interest in venturing into the Bollywood concert promotion business. Prior to the concert tours at issue, neither Jagroop nor Daljeet Khela had ever served as either a local or an international concert promoter. In furtherance of their desire to venture into the Bollywood tour promotion business, Jagroop and Daljeet Khela in August 2003 formed Khela Brothers, a California corporation with its principal place of business in Fresno, California. Jagroop Khela is President of Khela Brothers, and Daljeet Khela serves as its Vice President.

## A. Temptation 2004–San Francisco Show

6. During the summer of 2003, Taneja was planning a Bollywood show in the San Francisco, California area starring SRK. This show, ultimately titled "Temptation 2004," was referred to by several names during the planning phase, including "Fires and Flames," "Heartbeats," and "Heartbeats of Bollywood."

7. In July 2003, during the planning phase, Jagroop Khela approached Taneja to request that he and his brother Daljeet serve as the local promoters for the Temptation 2004–San Francisco show. This show was scheduled for July 3, 2004.

8. Taneja testified credibly and convincingly[2] that, following negotiations, Elite and Khela Brothers reached an oral agreement in October 2003, pursuant to which Khela Brothers would serve as the local promoter for the Temptation 2004–San Francisco show. According to Taneja, the terms of the agreement were (i) that Khela Brothers would act as the local promoter and perform all the duties of a local promoter; (ii) that Khela Brothers would pay Elite a fee of $500,000 for the local promotion rights; (iii) that $150,000 of that fee was due immediately; (iv) that Khela Brothers would pay Elite three (3) installments of $100,000 every sixty days; (v) that the remaining $50,000 would be due on the day of the planned concert; and (vi) that the parties would follow industry custom concerning the respective rights and responsibilities of the international and the local promoter. This oral agreement was reached in the course of a telephone call

---

2. Taneja's testimony was credible and convincing throughout. To the extent that his testimony conflicted with that of other witnesses, Taneja's testimony is credited over that of other witnesses.

between Taneja and the Khelas; Taneja and Daljeet Khela were together in a hotel room in Los Angeles; Jagroop Khela was elsewhere and participated in this discussion via conference call.

9. Taneja also testified credibly and convincingly (i) that he intended this agreement to be memorialized in writing; (ii) that he gave Khela Brothers a copy of the contract he typically used when entering into an agreement with a local promoter; (iii) that it is Taneja's standard practice not to sign the contract until the local promoter returns the signed contract; and (iv) that, despite repeated assurances from Jagroop and Daljeet Khela that the contract would be signed and returned, this never occurred.[3]

10. Elite claims that Khela Brothers has paid only $88,000 of the $500,000 it owed on the Temptation 2004–San Francisco oral contract. By contrast, Khela Brothers claims it has paid Elite $237,000 under this contract. On the basis of Taneja's testimony, as well as the record as a whole, it appears that defendants have paid $188,000 of the $500,000 they owed Elite pursuant to the Temptation 2004–San Francisco oral contract as described by Taneja. Specifically, the record reflects that the following four payments were made to Elite on behalf of Khela Brothers for the Temptation 2004–San Francisco show:

| Date | Amount | Payor |
| --- | --- | --- |
| January 6, 2004 | $37,000 | Music Hut [4] |
| January 8, 2004 | $50,000 | Music Hut |
| April 20, 2004 | $50,000 | Sima Elemadi [5] |
| May 14, 2004 | $50,000 | Avnish Agnihotri [6] |

11. In addition to these four payments, the record reflects that on May 18, 2004, Avnish Agnihotri wired $50,000 to Elite. This money was not intended as partial payment of the Khela Brothers' contractual obligations to Elite; rather, it was intended as a loan to Khela Brothers from Balkar Singh, an associate of the Khelas. The record is unclear what relationship, if any, existed between Avnish Agnihotri and Balkar Singh. And, the record is equally unclear on why Agnihotri wired the money through Elite rather than sending it directly to Khela Brothers. Nonetheless, the record confirms (i) that these funds were intended as a loan to Khela Brothers; and (ii) that Taneja treated it as such. After receiving the funds, Taneja on May 18, 2004 wired $49,000 to the Khela Brothers. Because the bank expressed concern to Taneja about this transaction, Taneja withheld $1,000 from the amount wired to Khela Brothers and credited these funds towards Khela Brothers' obligations with respect to the Temptation 2004–San Francisco show.

12. On June 18, 2004, Daljeet Khela emailed Taneja informing him that Khela Brothers no longer intended to serve as local promoter for the Temptation 2004–

3. Defendants offer a document they claim is the written contract Elite and Khela Brothers entered into on January 25, 2004 with respect to the Temptation 2004–San Francisco show. This document, the record shows, is not genuine; Taneja's signature is forged. See infra, paras. 19–22. Moreover, the terms of this agreement confirm its invalidity; the contract purports to assign the local promotion rights to Khela Brothers for $250,00, less than half the amount for which Elite later resold the show's local promotion rights to another local promoter on short notice after Khela Brothers disclaimed interest in continuing to serve as

the local promoter. Defendants offer no credible explanation why Taneja, an experienced international promoter, would offer defendants a discount of this magnitude.

4. Music Hut is a company partially owned by the Khelas.

5. Sima Elemadi is a business associate of the Khelas.

6. Avnish Agnihotri is a business associate of the Khelas.

San Francisco show. Following this communication, Elite resold the local promoter's rights to this show to Paul Singh, another local promoter, for $525,000. Given this, Taneja makes no claim here against Khela Brothers for breach of the Temptation 2004–San Francisco oral contract.[7]

## B.  The United Kingdom Tours

13.  During the fall of 2003, Taneja commenced planning two Bollywood tours in the United Kingdom for the following year.  The first tour, ultimately titled "Heartthrobs Will Leave You Breathless," ("Breathless–U.K.") which co-starred Hrithik Roshan and Aishwarya Rai, was alternately referred to during the planning phase as "Rocking Stars of Bollywood," "Heartthrobs," "Breathless," and "Breathless Heartthrobs."  Breathless–U.K. was a three-show tour with performances in Manchester on April 9, 2004, London on April 11, 2004, and Birmingham on April 12, 2004.

14.  The second tour, alternately referred to during the planning phase as "Heartbeats" and "Temptations," ("Heartbeats–U.K.") starred SRK. The Heartbeats–U.K. tour consisted of three performances in the same British cities originally scheduled for June 2004, but ultimately occurring in September 2004.

15.  The parties' testimony concerning these two tours is sharply conflicting.  They agree (i) that during the fall of 2003, Taneja had several conversations with the Khelas regarding these two tours; (ii) that during one such conversation in December 2003, Jagroop Khela requested Taneja not contract with any other local promoter for the Heartbeats–U.K. shows without giving Khela Brothers the right of first refusal, to which Taneja agreed; and (iii) that they reached contractual arrangements with respect to these two U.K. concert tours.  The parties differ, however, with respect to form and content of these contracts.

16.  Taneja testified credibly and convincingly that, following extensive negotiations, Taneja, on behalf of Elite, and Jagroop Khela, on behalf of Khela Brothers, reached an oral agreement with respect to both tours during a telephone conversation in late December 2003.  Pursuant to this agreement, Elite would serve as the international promoter for both tours, and Khela Brothers would serve as the local promoter for the tours.  More specifically, the parties agreed to the following contract terms:  (i) Elite would sell the local promoter's rights to Breathless–U.K. to the Khela Brothers for £675,000[8]; (ii) Elite would sell the local promoter's rights to Heartbeats–U.K. tour for £715,000[9]; and

7.  Although this tour itself is not at issue, the facts and circumstances of it are relevant for purposes of credibility and to show the parties' custom and practice in contracting for the local promotion rights for Bollywood shows.

8.  Taneja testified that he inadvertently erased the computer-stored, written contract for Breathless–U.K. stored on his computer that set forth the terms of the parties agreement, including the parties' agreed-upon payment schedule.  Although Taneja was unable to recall the precise amounts due on specific dates, he testified credibly and convincingly that the payment schedule was "front-load-

ed," and was structured similarly to the payment schedules the parties reached with respect to Temptation 2004–San Francisco and Heartbeats–U.K. *See* para. 8 and n. 9.

9.  Although it was not ultimately material because Khela Brothers anticipatorily repudiated the Heartbeats–U.K. contract, Taneja testified credibly and convincingly that the parties agreed to the following payment schedule with respect to Heartbeats–U.K.:  (i) £205,000 of that fee was due immediately; (ii) £250,000 was due in 45 days;  (iii) £150,000 was due in 60 days;  and (iv) the remaining £110,000 would be due on June 10, 2004, the originally-scheduled date of the first concert.

(iii) for both tours, the parties' respective rights and obligations would mirror both industry custom and the agreement the parties had reached in October 2003 regarding the Temptation 2004–San Francisco show. In particular, the record persuasively reflects that ticket pricing for the various shows was the prerogative and final responsibility of the Khela Brothers as the local promoter, although the parties agree that the Khelas were free to consult Taneja in this regard. These oral agreements were not reduced to formal writings at the time.

17. On January 24 and 25, 2004, Taneja spoke with the Khelas several times by telephone and in person, as well. Taneja testified credibly and convincingly that during these conversations, the parties modified their earlier oral agreement with respect to Breathless–U.K. Specifically, the parties agreed (i) that Elite would lower its international promoter's fee for Breathless–U.K. to £625,000; and (ii) that Khela Brothers would pay Elite a £25,000 bonus in the event the Breathless–U.K. tour proved profitable. This modification was never memorialized in writing, but the record convincingly reflects that the parties orally agreed to this modification.

18. The Khelas in their testimony differed sharply with Taneja on the terms of the parties' contracts. According to the Khelas, the parties reached written agreements for both U.K. tours, the terms of which differed markedly from those Taneja described. Specifically, Khela Brothers argues that, on January 25, 2004, the parties agreed in writing (i) that Elite would sell local promotion rights to Khela Brothers for the Heartbeats–U.K. tour for £350,000; and (ii) that Elite and Khela Brothers would serve as partners or joint venturers for the Breathless–U.K. tour, sharing costs and profits or losses equally. In support of their claims, the Khelas offered three documents they allege are the written, signed contracts between Elite and Khela Brothers regarding (i) the Temptation 2004–San Francisco show; (ii) the Breathless–U.K. tour; and (iii) the Heartbeats–U.K. tour, respectively. Taneja adamantly denies ever signing any of these documents. Both forensic analysis and the terms of the written contracts themselves confirm the contracts are not genuine.

19. Gerald Richards, an expert in "questioned document" examination, testified credibly and convincingly that the signature alleged to be Taneja's on each of these purported contract documents was absolutely identical in every respect, a fact that confirmed they were forgeries or fakes. To compare the documents, Richards colored each contract's signature page's text a different color. Then, by placing each of these differently colored pages one over the other using transparencies, Richards demonstrated the degree of similarity between the text on each signature page. Specifically, where the text of the two pages aligned perfectly, the two colors would "blend" to form a third color, highlighting their identicality. By contrast, where the text of the two pages did not align, the initial colors would remain visible. From this comparison of the various signature pages, Richards demonstrated and concluded that the signature pages of the Heartbeats–U.K and the Breathless–U.K. contracts were absolutely identical, including the signatures of both Taneja [10] and Jagroop Khela. From this, Richards concluded that the signatures on the Heartbeats–U.K. contract produced by Khela Brothers were photocopies of the signatures on the Breathless–U.K. contract, or vice versa, or that the signatures on both contracts must be

---

10. Taneja's initials, not his full name, appear on each document.

and were photocopies of yet another document that itself may or may not contain genuine signatures.[11]

20. Using this color-overlay method to compare the contracts, Richards also determined that, although the Temptation 2004–San Francisco show contract's signature page's text did not match the text of either of the other two signature pages, the Taneja signature on the Temptation 2004–San Francisco contract was identical to the two Taneja signatures on the two U.K. contracts. Accordingly, Richards testified credibly and convincingly that (i) that it is impossible manually to produce three identical signatures; and (ii) the only way to produce multiple signatures with this extreme degree of similarity is through the use of photocopy or other similar technology. From this Richards testified that there were two possible conclusions with respect to the genuineness of Taneja's signatures: (i) that Taneja's signature on one [12] of these contracts might be genuine, and this genuine signature was then photocopied or otherwise "cut and pasted" onto the other two contracts; or (ii) that none of the Taneja signatures on the contracts in question were genuine, but that all had been photocopied or "cut and pasted" from a fourth document that might or might not itself contain a genuine signature. At a minimum then, Richards' forensic analysis establishes that at least two of the Taneja signatures on the three contracts offered by defendants are not authentic. There is no plausible reason why defendants would forge two, but not three, of the three contracts at issue. Given this, Richards' testimony supports the conclusion that none of Taneja's signatures on the putative contracts offered by defendants is authentic, and that all were forged either by defendants or their agents. This conclusion is consistent with Taneja's firm and unequivocal testimony that he did not sign any of the documents proffered by the Khelas as the signed contracts for the U.K. shows.

21. Quite apart from the false signatures, the contract terms in these documents also point persuasively to the conclusion that the documents are not genuine. Thus, the putative Heartbeats–U.K. contract states that Elite sold local promoter's rights to Khela Brothers for £350,000. This contract, allegedly finalized some five months before the originally scheduled concert dates, called for a Elite to sell promotion rights for £125,000 less than the £475,000 Elite later resold these same rights to another local promoter, Farhath Hussein, in June 2004 after Khela Brothers repudiation.[13] Defendants offer no credible explanation why Taneja, an experienced promoter, would offer defendants a discount of this magnitude.[14]

11. Richards was not offered as a handwriting expert, and he expressed no opinion on whether the signatures at issue were actually Taneja's. Rather, Richards testified that some or all of these signatures alleged to be Taneja's were photocopies, not actual signatures. In other words, someone other than Taneja used a photocopy of a Taneja signature to create the proffered contract documents.

12. Mr. Richards testified that he could not determine which, if any, of Taneja's signatures was genuine.

13. See para. 48.

14. Both Jagroop and Daljeet Khela testified that Taneja complained to them on many occasions about financial difficulties he was having. Significantly, defendants offered no other evidence to support or corroborate their contention that Taneja was experiencing financial difficulties. But, even assuming the truth of this allegation, it hardly makes it likely that Taneja would have sold these shows to defendants at a substantially below-market rate.

22. The terms of defendant's proffered Breathless–U.K. contract are so unfavorable to Elite as to be of doubtful validity on that ground alone. The contract offered by defendants pertaining to the Breathless–U.K. tour calls for the parties to engage in a joint venture requiring the sharing of costs and profits or losses equally. Not only is there no record evidence that Taneja has ever entered into a joint venture with a local promoter, defendants offer no credible reason why he would do so for the first time with persons who had never before served as a local promoter for any concert tour, let alone an overseas concert. Moreover, it is highly suspect that of the three tours on which Elite and Khela Brothers collaborated, the only one to lose money was the one defendants contend the parties agreed to share losses equally. For all of these reasons, the two putative U.K. contracts for Breathless–U.K. and Heartbeats–U.K. (and Taneja's initials contained therein) offered by defendants are not genuine.

23. Elite claims that Khela Brothers has paid only £233,528.70 of the £1,340,000 it owes on the two U.K. contracts. Defendants differ sharply, claiming that Khela Brothers has paid Elite a total of £202,528. The crux of this dispute is the parties' conflicting testimony concerning whether Daljeet Khela gave Taneja £160,000 in cash in Taneja's London hotel room on April 11, 2004. On the basis of Taneja's testimony, as well as the record as a whole, it is more likely than not that no such transaction occurred; rather, the record convincingly reflects that defendants have paid Elite £234,879.08 of the £1,340,000 they owe on the two U.K. contracts. Specifically, the record reflects that Khela Brothers or their agents made nine payments to Elite, each of which is listed in the chart below.

| Date | Amount | Payor |
| --- | --- | --- |
| February 9, 2004 | £40,000 | Harpal Singh |
| February 24, 2004 | £60,000 | Harpal Singh |
| March 2, 2004 | £25,000 | Harpal Singh |
| Early April, 2004 | £46,000 | Khela Brothers |
| April 8, 2004 | £750 | Daljeet Khela |
| April 10, 2004 | £600 | Khela Brothers |
| April 14, 2004 | £20,000 | Khela Brothers |
| April 16, 2004 | £25,459.38 | SMG/Manchester Arena |
| April 23, 2004 | £17,069.70 | Khela Brothers |

21. During the second week of January 2004, Daljeet Khela traveled to Virginia and informed Taneja that he wanted a writing to evidence the parties' contract with respect to the Heartbeats–U.K. tour so that he might show this writing to persons or entities in the U.K. who might assist Khela Brothers in their efforts to promote the shows locally. Taneja printed out a copy of this contract from his computer and gave it to Daljeet Khela. Taneja did not sign this contract, as his typical practice was to sign the contract after the local promoter had done so and returned the signed contract to him. Despite Taneja's several requests that Khela Brothers sign and return this contract, Khela Brothers never did so.

22. On February 9, 2004, Harpal Singh wired Elite £40,000 on Khela Brothers' behalf. Khela Brothers did not specify the tour or the contract or contracts to which this payment should be credited.

23. By signed, written agreement dated February 11, 2004, Khela Brothers entered into a contract with SMG Limited pursuant to which Khela Brothers reserved the Manchester Arena for the Breathless–U.K. event in Manchester on April 9, 2004.

24. On February 24, 2004, Harpal Singh wired Elite £60,000 on Khela Brothers' behalf. Again, Khela Brothers did not

specify the tour or the contract or contracts to which this payment should be credited.

25. On March 2, 2004, Harpal Singh wired Elite £25,000 on Khela Brothers' behalf. Here yet again, Khela Brothers did not specify the tour or the contract or contracts to which this payment should be credited.

26. During the first week of April 2004, Khela Brothers delivered a total of approximately £61,000 in ticket proceeds to the show director for the Breathless–U.K. shows. After Taneja paid the performers £15,000 "allowance" money [15] for meals, lodging and other expenses that Khela Brothers were obligated to pay, Taneja credited the remaining £46,000 to Khela Brothers' obligation under the Breathless–U.K. contract.

27. Before and after each of the three Breathless–U.K. shows, Taneja repeatedly asked both Khelas to pay the funds Khela Brothers were obligated to pay. They did not do so, and put Taneja off on most occasions. On two occasions, however, the Khelas gave Taneja small sums of cash: On April 8, 2004, Daljeet Khela gave Taneja approximately £750 generated by ticket sales for Breathless–U.K. Also, on April 10, 2004, Khela Brothers delivered approximately £600 to Taneja by messenger, also from ticket sales for Breathless–U.K.

28. For each of the three concerts on the Breathless–U.K. tour, patrons could purchase tickets either (i) at stores in or around Manchester, London, and Birmingham that Khela Brothers had designated as local ticket vendors; or (ii) at the performance venue itself on the night of the concert. With respect to ticket sales by local vendors, Khela Brothers tasked three of its employees to collect the ticket proceeds from local vendors in each city: Tejinder Randhawa, an employee of Khela Brothers until June 2005, collected ticket proceeds from vendors in Manchester; Jagmeet Singh, also a former employee of Khela Brothers, collected ticket proceeds from vendors in London; and Harpal Singh, a business partner of Khela Brothers, collected ticket proceeds from vendors in Birmingham. None of these persons counted the proceeds they collected; rather, they simply delivered the funds to either Jagroop or Daljeet Khela. With respect to tickets sold at the performance venues, venue personnel collected funds paid by patrons, deducted any outstanding expenses owed by Khela Brothers, and wired the net profits to Khela Brothers. After the April 9, 2004 show in Manchester, officials at Manchester Arena notified Khela Brothers that they would wire them the net proceeds from the show, which amounted to £25,459.38. On Khela Brothers' instruction, however, these proceeds were wired directly to Elite. Following the April 11, 2004 show in London, officials at Wembley Arena sent Khela Brothers £83,403.24. Following the April 12, 2004 show in Birmingham, officials from the Birmingham venue wired Khela Brothers £50,810.

29. After the London show on April 11, 2004, Taneja met with the Khelas and some of their associates in his hotel room. The Khelas testified that Daljeet Khela gave Taneja approximately £160,000 in cash at that meeting, which Taneja adamantly denies. The Khelas' associates, Harpal Singh, Tejinder Randhawa, and Paramjit Gill, testified that they saw Daljeet Khela give money to Taneja during

---

**15.** Under the terms of Elite's contracts with the performers, Elite was obligated to pay the performers £5,000 for each of the three performances on the Breathless–U.K. tour. Under the terms of the oral contract between Elite and Khela Brothers, Khela Brothers was responsible for reimbursing Elite for these expenses. *See* paras. 3 and 16.

this meeting. Taneja's testimony in this regard was credible and convincing; the Khelas' testimony and that of their associates was not. The Khelas' testimony is not credible in this respect in part because they have offered contracts that do not appear to be genuine [16] and because they have offered no documentary evidence whatsoever to corroborate their claim that they gave Taneja £160,000 in cash in the London hotel room. For instance, there is no record evidence that Taneja gave the Khelas a receipt for this money, nor are there any banking records suggesting Taneja received such a large sum of cash around this time.

30. With respect to the Khelas' associates' testimony regarding the April 11 meeting, their testimony is suspect because (i) none of them has any personal knowledge about the amount of the money that was transferred; and (ii) there is reason to believe that their testimony is biased. With respect to the associates' personal knowledge, each stated that he did not count the money they claim the Daljeet Khela delivered to Taneja. With respect to bias, each of the associates who testified Daljeet Khela gave Taneja money in the hotel room stands to gain financially if Khela Brothers prevails in this litigation. Specifically, Harpal Singh's testimony is not credible because he acknowledged (i) that the Khelas owe him £125,000, and (ii) the Khelas have promised to repay him if they prevail in this lawsuit. Randhawa's testimony is not credible in this regard because he claims that Khela Brothers owes him £22,000, and that he expects Khela Brothers to repay him from the proceeds of this lawsuit. Gill's testimony is not credible in this regard because he claims that Khela Brothers owes him £4,500, and that he expects Khela Brothers

to be able to continue in the concert promotion business if they win this lawsuit.

31. At the conclusion of the April 12, 2004, Breathless–U.K. concert in Birmingham, both Khelas told Taneja that they wanted out of the concert promotion business and the contract for the Heartbeats–U.K. tour, and to apply whatever funds Khela Brothers had already paid Elite to Khela Brothers' Breathless–U.K. obligation. The Khelas later recanted, each telling Taneja individually that they still wanted to promote the Heartbeats–U.K. tour, and that they would make good on their contractual obligations for both tours.

32. On approximately April 14, 2004, Khela Brothers delivered £20,000 to the Breathless–U.K. show director, which the director subsequently gave to Taneja.

33. On April 16, 2004, pursuant to Khela Brothers' instruction, SMG wired to Elite £25,459.38 it owed to the Khela Brothers from ticket proceeds at Manchester.

34. On April 20, 2004, Sima Etemadi, a business associate of the Khelas, wired $50,000 to Elite. Because the funds were in dollars rather than pounds, and because Ms. Etemadi did not specify how Elite should apply these funds, Elite credited these funds towards Khela Brothers' SRK–San Francisco obligation.[17]

35. On April 23, 2004, Khela Brothers wired $29,980 to Elite. Khela Brothers instructed Elite to credit these funds towards Khela Brothers' Breathless–U.K. deficit. Elite credited £17,069.70 to Khela Brothers Breathless–U.K. deficit.

36. In a June 12, 2004 email to Taneja, Jagroop Khela stated (i) that Elite had informed Khela Brothers that Elite's international promoter's fee was £625,000 for

---

**16.** *See* paras. 19–22.

**17.** *See supra,* para. 10.

the Breathless–U.K. tour; and (ii) that Elite had informed Khela Brothers that Elite's international promoter's fee was £700,000 for the Heartbeats–U.K. tour.

37. On June 18, 2004, Daljeet Khela emailed Taneja informing him that Khela Brothers had no interest in serving as local promoter in any further Bollywood concerts.

38. Following this communication, Elite resold the Heartbeats–U.K. show to Farhath Hussein, a rival promoter to Elite, in July 2004 for $860,000, which equated to £475,000.

## II. Conclusions of Law

39. As this is a federal diversity suit, the substantive law and choice of law rules of the forum state-in this case Virginia—govern the alleged claims. *See Hitachi Credit America Corp. v. Signet Bank,* 166 F.3d 614, 623–624 (4th Cir.1999) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). And, under Virginia choice of law rules, the law of the place of performance-which, again, is Virginia-governs contract payment and performance issues such as those involved here. *See Equitable Trust Co. v. Bratwursthaus Mgmt. Corp.,* 514 F.2d 565 (4th Cir.1975); *Erie Ins. Exchange v. Shapiro,* 248 Va. 638, 640, 450 S.E.2d 144 (1994). Because payment of the contracts was to be performed in Virginia, the construction, validity, and interpretation of the contracts at issue are also governed by Virginia law. *See Poole v. Perkins,* 126 Va. 331, ——, 101 S.E. 240 (1919).[18]

40. In Virginia, an oral contract is binding if its terms are sufficiently definite and certain to render the contract enforceable. *See, e.g., Harris v. Citizens Bank & Trust Co.,* 172 Va. 111, 143, 200 S.E. 652 (1939); *U.S. v. Newport News Shipbuilding & Dry Dock Co.,* 571 F.2d 1283, 1286 (4th Cir.1978). To prove the formation of an enforceable oral contract, the plaintiff must show the parties reached agreement with respect to the contract's material terms. *See, e.g., Allen v. Aetna Casualty and Surety Co.,* 222 Va. 361, 381, 281 S.E.2d 818 (1981). And, even where, as here, a subsequent formal written agreement is contemplated, an oral contract is valid provided the parties' intention to be bound is objectively manifested. *See, e.g., Snyder–Falkinham v. Stockburger,* 249 Va. 376, 381, 457 S.E.2d 36 (1995); *North America Mgrs. v. Reinach,* 177 Va. 116, 121, 12 S.E.2d 806 (1941); *Agostini v. Consolvo,* 154 Va. 203, 212–13, 153 S.E. 676 (1930).

42. In an action for breach of contract, a plaintiff must demonstrate (i) an enforceable contract, (ii) a material violation or breach of that contract, and (iii) a consequential injury or damage to the plaintiff. *See Westminster Investing Corp. v. Lamps Unlimited, Inc.,* 237 Va. 543, 546, 379 S.E.2d 316 (1989).

43. The record evidence amply reflects that Elite has shown by a preponderance of the evidence (i) that the Elite and Khela Brothers entered into binding oral contracts regarding the Breathless–U.K. tour and the Heartbeats–U.K. tour; (ii) that these contracts required, *inter alia,* Khela Brothers to pay Elite a fee of £625,000 [19]

---

18. Additionally, there is no indication that the parties contest this forum's appropriateness. Indeed, the parties have willingly litigated this entire dispute in courts located in Virginia.

19. There is insufficient evidence in the record to determine whether the Breathless–U.K. tour was sufficiently profitable to trigger Khela Brothers' obligation to pay Elite an additional £25,000 in accordance with a later oral modification to the contract. *See* para. 17. Accordingly, the contract local promoter's fee

and £715,000, respectively, in exchange for the local promotion rights to each tour.

■■ 44. A material breach of contract occurs if a party fails to do something that he is bound to do according to the contract and that is so important and central to the contract that the failure defeats the very purpose of the contract. *See, e.g., Horton v. Horton,* 254 Va. 111, 115, 487 S.E.2d 200 (1997). With respect to the Breathless–U.K. tour, Khela Brothers failure to pay Elite the full £625,000 it owed on the schedule the parties established constituted a material breach of that contract. Although Elite had missed several payment deadlines under the Breathless–U.K. contract, Taneja forgave these omissions and continued to work with Khela Brothers in the hope that it would ultimately meet its obligations. In the end, Khela Brothers failed to do so. Khela Brothers breached the Breathless–U.K. contract definitively on June 18, 2004 when Jagroop Khela emailed Taneja notifying Elite that Khela Brothers no longer intended to serve as local promoter for the Heartbeats–U.K. or to make further payments towards its Breathless–U.K. obligations.

■ 45. To establish breach of contract on the basis of anticipatory repudiation, the repudiation must be clear and unequivocal, and it must cover the entire performance of the contract. *See Supervisors v. Ecology One,* 219 Va. 29, 33, 245 S.E.2d 425 (1978); *Simpson v. Scott,* 189 Va. 392, 400, 53 S.E.2d 21 (1949).

■■ 46. With respect to Heartbeats–U.K., Jagroop Khela's June 18, 2004 email to Taneja constituted an anticipatory repudiation of the parties' contract. An anticipatory repudiation of a bilateral contract gives the non-repudiating party three options. The non-repudiating party, in this case Elite, may: (i) rescind the contract altogether; (ii) elect to treat the repudiation as a material breach, either by bringing suit promptly or by making some change of position; or (iii) await the time for performance of the contract and bring suit after that time has arrived. *See Simpson v. Scott,* 189 Va. 392, 398, 53 S.E.2d 21 (1949). Elite appropriately treated Khela Brothers' repudiation of their Heartbeats–U.K obligations as a material breach of that contract.

■ 47. The analysis of the Heartbeats–U.K. matter does not end here, for in Virginia the non-breaching party, here Elite, is obligated to mitigate its damages. More specifically, where the non-breaching party does not make reasonable efforts to mitigate its damages, it may not recover the additional damages incurred. *See, e.g., Forbes v. Rapp,* 269 Va. 374, 379–80, 611 S.E.2d 592 (2005); *Lawrence v. Wirth,* 226 Va. 408, 412, 309 S.E.2d 315 (1983).

■ 48. The record clearly reflects that Elite took reasonable steps to mitigate the damages caused by defendants' breach by promptly reselling the local promotion rights to the Heartbeats–U.K. tour to another local promoter, Farhath Hussein, for £475,000. No evidence was offered by defendants to prove that this act of mitigation was in any respect unreasonable. Put differently, there is no evidence that Elite, at that late date, could have resold the local promotion rights more promptly or for more money. As a result of its reasonable mitigation efforts, Elite suffered only £240,000 in damages as a result of Khela Brothers' breach of the Heartbeats–U.K. tour contract.

used here does not include this conditional bonus; rather, it reflects the parties' negotiated agreement that Elite's "base" international promoter's fee for the local promotion rights to the Breathless–U.K. tour was £625,000.

49. Khela Brothers paid only £234,-879.08 of the £625,000 it was contractually obligated to pay under the parties' Breathless–U.K. contract. As a result, Elite suffered £390,120.92 in damages as a proximate result of Khela Brothers' breach of the Breathless–U.K. contract.[20]

50. Elite proved the amount of its contract damages in British pounds sterling. This presents the question whether to convert the damage amounts to dollars, and, if so, what exchange rate is appropriate. In a diversity action, it seems clear that the proper date for conversion of foreign currency debts or contract damages is a question of state law—here Virginia law. *See Competex, S.A. v. Labow,* 783 F.2d 333, 334 (2d Cir.1986) (holding that determination of date on which to convert a foreign currency debt for breach of contract is a question of state law). And, it appears to be one of first impression in Virginia. A survey of the authority on this point from other jurisdictions discloses that where, as here, the parties did not specify who would bear the risk of exchange rate fluctuations in the event of a contract breach, courts have resolved this matter in three ways: (i) awarded damages in the foreign currency denominated in the contract; (ii) calculated damages based on the prevailing exchange rate at the time of judgment; or (iii) calculated damages based on the prevailing exchange rate at the time of breach. United States courts are sharply divided over the appropriateness of awarding damages in foreign currencies. *Compare ReliaStar Life Ins. Co. v. IOA Re, Inc.,* 303 F.3d 874, 882 (8th Cir.2002) (citing Restatement (Third) of Foreign Relations Law § 823

(1987)) ("While courts typically have chosen to award damages in U.S. dollars, nothing precludes a United States court from entering judgment in a foreign currency.") *with Gonzalez v. Banco de Santander–Puerto Rico,* 932 F.2d 999, 1004 n. 8 (1st Cir.1991) ("It is a settled principle of Anglo–American law that judgments for money damages must be rendered in the currency of the forum."). In any event, these courts do agree that entering judgment in a foreign currency is strongly disfavored. *See ReliaStar,* 303 F.3d at 882 (noting that U.S. courts typically enter judgment in U.S. dollars). Given this, and because awarding damages in foreign currency deprives the parties of the certainty that would result from a judgment in dollars it seems clear that the Supreme Court of Virginia, if presented with this question, would conclude that a judgment in dollars is more appropriate.

There is substantially more harmony among courts with respect to the applicable exchange rate. Courts generally agree that the judgment day interest rate is relevant only when the cause of action arises entirely under foreign law. Where, as here, the plaintiff has a cause of action arising under American law, the applicable exchange rate is the rate in effect on the date of the contract breach. *See, e.g., In re Good Hope Chemical Corp.,* 747 F.2d 806, 811 (1st Cir.1984); *ReliaStar,* 303 F.3d at 883; *Gonzalez,* 932 F.2d at 1003–04. Accordingly, for damage calculation purposes, the relevant date is June 18, 2004, the date on which Khela Brothers breached both U.K. contracts with Elite. The pound sterling-dollar exchange rate on that day was $1.84.[21] Using this exchange

---

**20.** It must be noted that Khela Brothers has made no claim or advanced any argument that the payments made to Elite with respect to the Temptation 2004–San Francisco show should be credited or returned to Khela

Brothers or the other individual defendants in view of Elite's successful effort to mitigate and cover.

**21.** This figure is found in plaintiff's admitted trial exhibit 27. This exhibit, a table of daily

rate, Elite suffered damages of $441,600.00 as a result of Khela Brothers' breach of the Heartbeats–U.K. contract, and $717,822.49 a result of Khela Brothers' breach of the Breathless–U.K. contract. Thus, Elite's total breach of contract damages are $1,159,422.49.

51. Khela Brothers and Elite were the only parties to the contracts at issue. There is no persuasive evidence to show that Elite contracted with the individual defendants; rather, the record convincingly reflects that Elite contracted only with Khela Brothers. Importantly, Elite presented evidence nor any argument to establish a claim that the veil of Khela Brothers should be pierced. Nor is such a claim easily established; under Virginia law, the requisite showing to pierce the corporate veil is a demanding one that plaintiff has not yet made. *See O'Hazza v. Executive Credit Corp.,* 246 Va. 111, 115–117, 431 S.E.2d 318 (1993) (specifying circumstances under which piercing corporate veil is appropriate). Neither reached nor decided here is whether Elite may yet do so in the course of collecting the judgment or in some other proceeding.

Accordingly, judgment will be entered in favor of Elite only with respect to Khela Brothers. An appropriate final judgment order will issue.

exchange rates between pounds sterling and dollars between January 2000 and April 2005,

is the only evidence in the record pertaining to exchange rates.